**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

*FOR PUBLICATION*

| | |
|---|---|
| In re: | Chapter 15 |
| Fairfield Sentry Limited, et al. | Case No. 10-13164 (JPM) |
| | (Jointly Administered) |
| Debtors in Foreign Proceedings. | |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 10-03636 (JPM) |
| ABN AMRO SCHWEIZ AG a/k/a AMRO (SWITZERLAND) AG, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

*APPEARANCES:*

**GIBSON, DUNN & CRUTCHER LLLP.**
Counsel for *UBS Jersey Nominees Limited*
200 Park Avenue
New York, New York 10166
By:     Marshall R. King
          Gabriel Herrmann

**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs Joint Liquidators*
Seven Times Square
New York, NY 10036
By:     Jeffrey L. Jonas
          David J. Molton
          Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.     INTRODUCTION

Pending before the Court is the motion of UBS Jersey Nominees Limited ("UBS Jersey" or "Defendant"), to dismiss the Fifth Amended Complaint (the "Amended Complaint") for lack of personal jurisdiction. Mot. to Dismiss, ECF[1] No. 853. The Court held a hearing on the Motion to Dismiss on May 3, 2024 (the "Hearing"). For the reasons set forth herein, the Court DENIES the Defendant's Motion to Dismiss.

## II.     JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). This Court previously concluded that it has subject matter jurisdiction over this and related actions. *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018); *see also* Stip. Order, ECF No. 577. Personal jurisdiction is contested by the Defendant and will be discussed below.

## III.     BACKGROUND

This adversary proceeding was filed on September 21, 2010. Compl., ECF No. 1. Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry"), Fairfield Sigma Limited (In Liquidation) ("Sigma"), and Fairfield Lambda Limited (In Liquidation) ("Lambda" and, together with Sentry and Sigma, the "Fairfield Funds") filed the Amended Complaint on August 12, 2021. Am. Compl., ECF No. 679. Via the Amended

---

[1]     Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03636-jpm unless otherwise noted.

Complaint, the Liquidators seek the imposition of a constructive trust and recovery of over $1.7

billion in redemption payments made by Sentry, Sigma, and Lambda to various entities known as

the Citco Subscribers. *Id.* ¶¶ 1–2, 205–06; *id.* Exs. A–C.[2]  Of that amount, Defendant allegedly

received over $4 million through redemption payments from its investment in Sentry.  Opp'n at

1, ECF No. 1146; Declaration of Joshua Margolin in Support of the Liquidator's Opposition

("Margolin Decl.") Exs. 11–13, 18, ECF No. 1147 (Citco and Sentry Redemption Records).

## A. <u>The BLMIS Ponzi Scheme</u>

This adversary proceeding arises out of the decades-long effort to recover assets of the

Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[3]  Am. Compl. ¶ 1.

The Citco Subscribers allegedly invested, either for their own account or for the account of

others, into several funds —including Sentry, Sigma, and Lambda —that channeled investments

into BLMIS.  *Id.* ¶¶ 2, 5, 15.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of

bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 133–

34; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools

money from numerous investors and then places it into a 'master fund' on their behalf. A master

fund—what Madoff Securities advertised its funds to be—pools investments from multiple

feeder funds and then invests the money.").  Fairfield Sigma and Lambda, in contrast, were

---

[2]       At the time of the filing of the Amended Complaint, the Plaintiffs made no specific allegations as to the
exact amounts received by any of the beneficial shareholders.  With respect to UBS Jersey, the Amended Complaint
states in relevant part that "[b]ased on Fund records, some or all of the Redemption Payments made to the Citco
Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, UBS
Jersey Nominees." Am. Compl. ¶ 110.  The Amended Complaint alleges that several other defendants may have
received redemption payments made to the Citco Subscribers.  *Id.* ¶¶ 34–112.  This opinion concerns only those
payments that the Plaintiffs allege were paid to UBS Jersey.

[3]       The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that
scheme have been recounted by many courts. *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818
F. App'x 48 (2d Cir. 2020).

indirect feeder funds, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currencies. Am. Compl. ¶¶ 133–34. BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme. *Id.* ¶¶ 5–7, 13. Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart. *Id.* ¶¶ 7–8, 12–14, 134.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV"). *Id.* ¶ 7. The Citco Subscribers and the beneficial shareholders were allegedly such investors. *Id.* To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 136. In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 137. The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id.* The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares. *Id.* ¶ 139. The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments. *Id.*

UBS Jersey is organized under the laws of Jersey with a registered address in St Helier, Jersey, United Kingdom. *Id.* ¶ 110; Mem. L. at 2 n.3, ECF No. 854 (explaining that although the Amended Complaint incorrectly states that UBS Jersey is organized under the laws of the United Kingdom, "UBS Jersey accepts the Liquidators' allegation in this regard as true, because the relevant jurisdictional consequences are the same . . . ."). UBS Jersey allegedly invested into and

3

redeemed shares of the Fairfield Funds through Citco Bank Nederland N.V. ("Citco Bank") and

Citco Global Custody N.V. ("Citco Global Custody"). [4] Opp'n at 5, ECF No. 1146.

Citco Bank and Citco Global Custody were organized under the laws of either Curaçao or

the Netherlands. Mem. L. at 7 n.12. UBS Jersey invested in Sentry as early as 2001 via Citco

Bank and Citco Global Custody (the "Citco Subscriber"), which is alleged to have facilitated

investments in the Fairfield Funds for numerous shareholders in this proceeding. Opp'n at 5.

UBS Jersey opened an account at Citco Bank to receive subscription payments from and make

redemption payments to subscribers of the Fairfield Funds. Opp'n at 8. UBS Jersey allegedly

retained the Citco Subscriber as its agent when it entered into a brokerage and custody agreement

(the "B&C Agreement") [5] as early as January 2001. Id. at 5; Margolin Decl. Ex. 6 (Jan. 2003

B&C Agreement). The B&C Agreement authorized Citco Bank to provide "Brokerage

Services," defined to include "the effecting of transactions of and/or relating to the purchase and

sale of and dealing in Securities in the name of and for the account of" either UBS Jersey, Citco

Bank, or Citco Global Custody, and "any services ancillary thereto as set out in this Agreement."

Margolin Ex. 6 at -406–07, ECF No. 1147.

From June 2001 through October 2007, UBS Jersey allegedly subscribed through the

Citco Subscriber for 11,201.16 shares of Sentry. Opp'n at 6; *see also* Margolin Decl. Ex. 19

---

[4]    The Plaintiffs' opposition memorandum describes these two Citco entities as a single collective entity, defined as the "Citco Subscriber." Opp'n at 8 n.11, ECF No. 1146. The Amended Complaint refers to the "Citco Subscribers," a term that is defined to include both Citco Bank and Citco Global Custody, as relevant to this motion, and other Citco banking and custody entities. *See* Am. Compl. ¶ 8 (defining the Citco Subscribers to include "Citco Global Custody NV, Citco Global Custody (NA) NV, Citco Fund Services (BVI), and Citco Fund Services (Europe) BV . . . the Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch (a wholly owned subsidiary of Citco Bank Nederland N.V.) or the Citco Banking Corporation N.V.").

[5]    The Plaintiffs rely on a brokerage and custody agreement between UBS Jersey and the Citco Subscriber, dated January 10, 2003. Opp'n at 8 n.12. The Plaintiffs state that the 2001 B&C Agreement was not produced by UBS Jersey in discovery. *Id.*

(Sentry Subscription Records). UBS Jersey, through the Citco Subscriber, redeemed a total of $4,048,862.19 worth of shares from Sentry from May 2005 through November 2007. Opp'n at 12. In addition to these redemption payments, UBS Jersey allegedly received fees from the clients on whose behalf it invested. *Id.* at 12–13. At the directions and instructions of the Citco Subscriber, as the purported agent for UBS Jersey, "some . . . of the Redemption Payments were received at . . . designated United States-based bank accounts." Am. Compl. ¶ 141.

Bernard Madoff was arrested for alleged violations of federal securities laws on December 11, 2008. Am. Compl. ¶ 193. The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme. *Id.* On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 194. In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 195–96. Madoff was sentenced to 150 years in federal prison and died in April 2021. *Id.* ¶ 197.

The Amended Complaint alleges that the Citco Subscribers, including the purported agents of UBS Jersey, "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made. *Id.* ¶ 209. The Amended Complaint further asserts that, while receiving redemption payments, the Citco Subscribers "uncovered multiple additional indicia that Madoff was engaged in some form of fraud" but "turned a blind eye, [and] accept[ed] millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the law of the British Virgin Islands . . . ." *Id.* ¶¶ 8, 209. These indicia included verification that there was no "independent confirmation that BLMIS-held assets even existed," Madoff's failure to segregate duties, and

BLMIS's "employing an implausibly small auditing firm" rather than a reliable auditor.  *Id.* ¶¶ 9, 209.  In the face of red flags such as these, the Citco Subscribers and other Citco entities purportedly "quietly reduced [their] own exposure to BLMIS through the Funds, and significantly increase[ed] [their] Custodian fees to offset the risk."  *Id.* ¶ 209.

**B.    The Prior Litigation and Procedural History**

The Fairfield Funds were put into liquidation in the BVI in 2009.  *Id.* ¶¶ 26–29.  The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds.  *Id.* ¶ 29.  Pursuant to the appointment order of the BVI court,[6] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates."  *Id.* ¶ 203.  The Liquidators commenced actions in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme.  Mem. L. at 4, ECF No. 853; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings.  Am. Compl. ¶ 30, ECF No. 679.  This Court granted that recognition on July 22, 2010.  *Id.*  All cases filed by the Plaintiffs were administratively consolidated before this Court in November 2010.  *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

---

[6]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice."  *See* Am. Compl. at 1.

The Plaintiffs asserted multiple causes of action in those consolidated adversary proceedings including, *inter alia*, mistaken payment and constructive trust.[7] Compl. ¶¶ 63–86, ECF No. 8; *see also* 630 F. Supp. 3d at 479.  In October 2011, this Court stayed the U.S. proceedings pending resolution of the BVI proceedings.  *See* Am. Order Staying Redeemer Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for restitution based on mistaken payment.  *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014] UKPC 9 ("*Migani* ").[8]  The Privy Council held that the Plaintiffs' claims for restitution in the BVI to recover redemption payments arising out of transactions governed by the Funds' Articles of Association are governed by BVI law.  *Id.* ¶ 17.  The Plaintiffs' claims to recover redemption payments thus depended on whether Sentry was bound to make those payments under the "true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption."  *Id.* ¶ 19.  The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption.  *Id.* ¶ 21.  The redemption payments made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken.  *Id.* ¶¶ 18–19.

---

[7]    Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the implied covenant of good faith and fair dealing.  *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at 463, (S.D.N.Y. 2022).

[8]    *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL 1219748.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates. *See In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at *5–6 (Bankr. S.D.N.Y. Aug. 6, 2018). Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time. *See id.* at *6. The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith. *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295. Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called "Knowledge Defendants" to proceed. *Id.* at 301 ("The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust."). In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022). The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. Mot. to Amend, ECF No. 618; Mot.

to Amend, Adv. Pro. No. 10-03496, ECF No. 3737.  On August 5, 2021, this Court granted the

motion to amend the complaint and lifted the stay of the redeemer actions.  Order Granting Mot.

to Amend, ECF No. 676; Order Lifting Stay of Redeemer Actions, ECF No. 675.

## C.  **The Pending Motion**

The Amended Complaint seeks the imposition of a constructive trust on the redemption

payments received from the Fairfield Funds.  Am. Compl. ¶ 205, ECF No. 679.  The Amended

Complaint alleges that Defendant's purported agent, the Citco Subscriber, had knowledge of the

fraud at BLMIS and therefore knowledge that the NAV was inflated.  *Id.* ¶ 209.  "By reason of

their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been

unjustly enriched to the detriment of the [Fairfield] Funds and other shareholders and creditors of

the Funds." [9]  *Id.* ¶ 213.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts

recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully

blinds himself to that fact."  *Id.* ¶ 206 (citing 596 B.R. at 293).  As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the
> BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary
> duty; second, the beneficial receipt by the defendant of assets which are traceable
> as representing the assets of the plaintiff; and third, knowledge on the part of the
> defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou*

*v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the defendants, including UBS Jersey as a

beneficial shareholder of certain accounts, purposefully availed themselves of the laws of the

United States and the State of New York by "investing money with the Funds, and knowing and

---

[9]     As stated *supra*, footnote 2, the Amended Complaint alleges that several other defendants may have
received redemption payments made to the Citco Subscribers.  *Id.* ¶¶ 34–112.

intending that the Funds would invest substantially all of that money in New York-based

BLMIS." Am. Compl. ¶ 20, ECF No. 679.

The parties engaged in personal jurisdiction discovery between September 2021 and

August 2022. *See* Scheduling Order, ECF No. 714; Second Am. Scheduling Order, ECF No.

997. Merits document and expert discovery is ongoing in this case. *See* Fourteenth Am.

Scheduling Order, ECF No. 1321; Fifteenth Am. Scheduling Order, ECF No. 1336.

Defendant has moved to dismiss the Amended Complaint for lack of personal

jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts

with the forum to establish personal jurisdiction over Defendant and that exercising personal

jurisdiction would be unreasonable. *See* Mem. L. at 2–4; 19, ECF No. 854.

The Liquidators filed an opposition to the Motion and submitted the declarations of

Joshua Margolin and Sara Joyce in support of their opposition. Opp'n, ECF No. 1146; Margolin

Decl., ECF No. 1147; Declaration of Sara Joyce ("Joyce Decl."), ECF No. 1148.[10] The

Liquidators argue that exercising jurisdiction over Defendant would be reasonable and that

Defendant's contacts with the United States, through its own actions and those of its purported

agent, in knowingly and intentionally investing in Sentry, using U.S. correspondent accounts to

invest in and receive payments from Sentry, and conducting other business activities support

personal jurisdiction. Opp'n at 2–4, ECF No. 1146. Defendant filed a reply memorandum on

---

[10]    Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed
under seal. At the Hearing on the motion, the Court gave the parties the opportunity to withdraw from the record
any previously-sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the
opinion. Hr'g Tr. 12:5–17, ECF No. 1352. None of the parties in this matter requested information withdrawn. The
Court will nevertheless refrain from referring to any bank account numbers or names of individual employees,
named only in sealed documents, in full.

August 2, 2023.  Reply, ECF No. 1253.  This Court reviewed the above filings and held a

hearing on the Motion on May 3, 2024.  *See* Hr'g Tr., ECF No. 1352.[11]

## IV.   DISCUSSION

### A.  The Law of Personal Jurisdiction

In order to subject a defendant to personal jurisdiction in the United States, due process

requires that the defendant have sufficient minimum contacts with the forum in which the

defendant is sued "'such that the maintenance of the suit does not offend traditional notions of

fair play and substantial justice.'"  *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501,

516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"In adversary proceedings, courts must determine whether the defendant has minimum contacts

with the United States, rather than with the forum state."  *Picard v. Fairfield Greenwich Grp. (In*

*re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman*

*Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)).  "When jurisdiction is satisfied

through Bankruptcy Rule 7004,[12] a bankruptcy court need not address its state's long-arm

statute."  *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124

F.3d 619, 630 (4th Cir. 1997).

---

[11]    The Court held hearings on May 3, 2024, on the motions to dismiss of multiple entities, including that of UBS AG, an entity represented by the same counsel as the Defendant, UBS Jersey.  UBS Jersey's and UBS AG's factual backgrounds and motions are similar, and Counsel presented arguments with respect to both UBS entities concurrently.  Hr'g Tr. 78:23–79:5 ("There's two UBS entities. There's AG and Jersey. . . . the relevant facts and law are similar to those relating to UBS AG [as they are to UBS Jersey]").  References to "UBS" without further designation made at the hearing and quoted in this opinion apply to both UBS entities.  However, the Court will address the motion to dismiss of UBS AG in a separate opinion.

[12]    "The summons and complaint and all other process except a subpoena may be served anywhere in the United States."  Fed. R. Bankr. P. 7004(d).  A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States."  Fed. R. Bankr. P. 7004(f).

An analysis of minimum contacts "focuses on the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted). There are three conditions necessary for the Court to exercise specific jurisdiction[13] over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2), the Plaintiffs "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-*

---

[13]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction. A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). The Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Mem. L. at 10, ECF No. 854 ("The Liquidators do not not—and credibly could not—assert that this Court has general jurisdiction over a foreign entity such as UBS Jersey, a company based in the Bailiwick of Jersey that is not 'at home' in the United States, and so Plaintiffs must plead facts supporting the exercise of specific jurisdiction over UBS Jersey."); Opp'n at 2 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

*Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Following discovery, "the plaintiff's prima

facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of

facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."

*Ball*, 902 F.2d at 197.  "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the

plaintiff need persuade the court only that its factual allegations constitute a prima facie showing

of jurisdiction.'"  *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL

5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85).  "Now

that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy."

*Averbach*, 2023 WL 5016884, at *6 (citing 722 F.3d at 85).  "Plaintiffs need only show that

their prima facie showing of jurisdiction is factually supported."  *Id.* at *6.  When considering a

motion to dismiss before or after jurisdictional discovery has taken place, "the court must

'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all

doubts, including factual disputes, in the plaintiff's favor."  *Id.* at *4 (quoting *Ball*, 902 F.2d at

197).

### B.  Analysis of Purposeful Availment

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the

defendant purposefully availed itself of the privilege of doing business in the forum and could

foresee being haled into court there."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68,

82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161,

170 (2d Cir. 2013)).  For specific personal jurisdiction, "'[c]ourts typically require that the

plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the

episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful

contacts with the forum.'"  *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine*

*Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)).  "Although a defendant's contacts with

the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or

other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an

insufficient basis for jurisdiction.'"  *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*,

571 U.S. at 134) (alteration in original).  "It is insufficient to rely on a defendant's random,

fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to

establish specific jurisdiction."  *Id.*

UBS Jersey asserts that the "Liquidators recently confirmed that the Redemption

Payments transpired entirely outside of the United States in their opening appellate brief to the

District Court challenging certain of Judge Bernstein's holdings in *Fairfield I*, *Fairfield II*, and

*Fairfield III*."  Mem. L. at 15, ECF No. 854.  The Plaintiffs argued before the District Court, that

"every relevant component of the transactions at issue here occurred outside the territorial

jurisdiction of the United States."  *Id.* at 16; *see also* Pls.-Appellants' Opening Br. for Second

Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y.

July 21, 2021), ECF No. 440 (the "Opening Brief").  The Plaintiffs' Opening Brief concerned the

extraterritorial application of the § 546(e)[14] safe harbor.  *See* Opening Brief at 24 (arguing that

the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply

extraterritorially to shield from avoidance settled securities transactions that occurred exclusively

outside the United States.").

---

[14]      Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment
or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant,
stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or
to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial
participant, or securities clearing agency, in connection with a securities contract. . . ."  11 U.S.C. § 546(e).  "By its
terms, the safe harbor is a defense to the avoidance of the *initial* transfer."  *Picard v. BNP Paribas S.A. (In re
BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

### 1. **Defendant's Use of Correspondent Accounts**

The Plaintiffs point to the choice and use of correspondent accounts by UBS Jersey and its agent[15] as sufficient to establish minimum contacts with the United States. Opp'n at 28–34, ECF No. 1146. "Correspondent accounts are accounts in domestic banks held in the name of

---

[15]    The Defendant does not "dispute that Citco's jurisdictional contacts can be imputed to UBS with[in] the scope of their agency . . . ." Hr'g Tr. 82:4–6, ECF No. 1352. Defendant believes that the Complaint inappropriately imputes the Fairfield Funds' own contacts to UBS Jersey "in the absence of an agency relationship and alter ego relationship, a department relationship, something like that." *Id.* 82:18–20. Whether the Plaintiffs impute Sentry's own contacts to the Defendant will be discussed *infra*, Section IV.B.3.

foreign financial institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)). Plaintiffs allege that UBS Jersey, through the Citco Subscriber, its purported agent, deliberately selected and repeatedly used U.S. correspondent accounts to effectuate the redemption payments that form the harms for which Plaintiffs seek redress. Opp'n at 28–30, ECF No. 1146.

Defendant argues that "all or nearly all the Redemption Payments at issue here occurred *abroad*." Reply at 11, ECF No. 1253 (emphasis in original). UBS Jersey believes that the Plaintiffs own allegations show that "the Redemption Payments were paid to accounts outside the United States . . . ." Mem. L. at 13, ECF No. 854. UBS Jersey points first to the B&C Agreement, which required it and all other beneficial shareholders to "maintain bank accounts with the Citco Banks outside of the United States, into which all Redemption payments were deposited." *Id.* at 8. UBS Jersey further points to an exhibit attached to the Amended Complaint which states that the redemption payments at issue here were made to a bank account labeled "Citco Global Custody (NA) NV, *Netherlands*." Mem. L. at 9 (emphasis in original). UBS Jersey believes that the redemption records produced to the Liquidators in jurisdictional discovery confirms this, where not one of the six requests for wire transfers "reflect[] routing of Redemption Payments to a New York account. Instead each Request indicates that the relevant Redemption Payment was sent directly to Citco global Custody NV's account at Citco Bank Nederland NV Dublin Branch." Reply at 13 (citing Margolin Decl. Ex. 18 at -673, ECF No. 1147).

The first step to redeem a share of Sentry was for UBS Jersey to submit a redemption request to the Citco Shareholder. Opp'n at 11, ECF No. 1146; *see, e.g.,* Margolin Decl. Ex. 11 at

16

-634 (Citco Bank confirmation of UBS Jersey's May 11, 2005, request for redeeming 57 shares

of Sentry).  The Citco Subscriber from whom UBS Jersey requested redemptions would then

submit a request on UBS Jersey's behalf to the investment manager of Sentry, the Fairfield

Greenwich Group ("FGG").  Opp'n at 11; *see, e.g.,* Margolin Decl. Ex. 12 at -841 (May 11,

2005, Citco Bank redemption request to FGG for redemption of 57 shares of Sentry).  This

redemption request that the Citco Subscriber sent to FGG would state the bank and account to

which the Citco Subscriber requested FGG send the redemption payments.  *See, e.g.,* Margolin

Decl. Ex. 12 at -841 ("WE REQUEST YOU TO WIRE THE REDEMPTION PROCEEDS IN

USD TO THE . . . ACCOUNT . . . OF CITCO BANK NEDERLAND N.V. WITH HSBC

BANK USA 452 FIFTH AVENUE NEW YORK, NY 10018 UNITED STATES . . . .").

        The Plaintiffs have submitted evidence showing the Citco Subscriber, on behalf of

Defendant, repeatedly instructed redemptions of Sentry shares be sent to an account in the

United States.  *See id.* Ex. 18 at -702 (Confirmation of Order Received for 16 shares of Sentry

delivered to HSBC Bank USA in New York with settlement date of March 3, 2007); *id.* at -010

(record of redemption of 57.07 shares of Sentry as valued on August 31, 2005, requested to be

sent to Citco Bank's account at HSBC Bank USA in New York); *see also id.* at -448, -253, -254,

-596, -675 (records of redemptions of redemption payments for shares of Sentry to be sent to

Citco Bank's account at HSBC Bank USA in New York).

        Plaintiffs acknowledge that "[c]ertain other transaction documents, such as Requests for

Wire Transfer Payment, related to UBS Jersey's redemption payments suggest that Sentry might

have sent some of UBS Jersey's redemption payments directly to the Citco Subscriber's account

at Citco Bank."  Opp'n at 12 n.14, ECF No. 1146.  Plaintiffs ask that any "ambiguity in the

documentary evidence should be resolved in the Liquidators' favor."  *Id.*  UBS Jersey replies that

"a court may not 'draw argumentative inferences in [a] plaintiff's favor' at this stage."  Reply at

14, ECF No. 1253 (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir.

2013).

The Second Circuit has made clear that courts evaluating a motion to dismiss for lack of

jurisdiction "will not draw 'argumentative inferences' in the plaintiff's favor."  *Robinson v.*

*Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (quoting *Atlantic Mut. Ins. Co. v.*

*Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir.1992) (citing, in turn, *Norton v. Larney*,

266 U.S. 511, 515, 45 S. Ct. 145, 147, 69 L. Ed. 413 (1925))).  If allegations sufficient to sustain

a court's exercise of jurisdiction do not "appear by the allegations of the bill or complaint, the

trial court, upon having its attention called to the defect or upon discovering it, must dismiss the

case, unless the jurisdictional facts be supplied by amendment.  *Norton v. Larney*, 266 U.S. at

515–16.  The Court will "however, construe jurisdictional allegations liberally and take as true

uncontroverted factual allegations."  *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d at 507

(citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 106 S. Ct.

1922, 1923–24, 90 L. Ed. 2d 413 (1986); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683,

1686, 40 L. Ed. 2d 90 (1974); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d

Cir. 1993)).  Furthermore, where there exist "conflicting affidavits, all factual disputes are

resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient

notwithstanding the contrary presentation by the moving party."  *In re Terrorist Attacks on Sept.*

*11, 2001*, 714 F.3d at 673 (quoting *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH &*

*Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993))

(quotation marks omitted in original).  Thus, while the Court will not infer support for Plaintiffs'

arguments notwithstanding contrary allegations or a lack of allegations, it is appropriate to

resolve factual disputes in their favor.

The Plaintiffs allege that Defendant received nine redemption payments from Sentry that

passed through U.S. correspondent accounts.  Opp'n at 31–32, ECF No. 1146.  Following

jurisdictional discovery, Plaintiffs provided support for six of those nine payments with

"corresponding Requests, and none reflect[] routing of Redemption Payments to a New York

account. Instead, each Request indicates that the relevant Redemption Payment was sent directly

to Citco Global Custody NV's account at Citco Bank Nederland NV Dublin Branch."  Reply at

13, ECF No. 1253; *see also* Hr'g Tr. 74:2–4 ("[T]he redemptions in many instances are not

alleged to have and the evidence seems to confirm did not pass through the United States.").

While some records of redemption requests may "indicate" that a payment was sent directly from

Sentry to Dublin, Ireland, other records from this same exhibit show requests seeking payments

to be made to correspondent accounts in New York or confirmations of orders received at those

accounts.  *Compare* Margolin Decl. Ex. 18 at -673, ECF No, 1147 ("Request for Wire Transfer

Payment" dated February 14, 2007, for shares in Sentry worth $19,307.39 to be made to Citco

Bank Nederland N.V. Dublin Branch with an address listed in Dublin, Ireland), *with id.* at -253

(August 10, 2007, request for redemption of 1,183.77 shares to be made to "HSBC BANK USA .

. . NEW YORK, NY . . . UNITED STATES OF AMERICA") and *id.* at -538 ("Confirmation of

Order Received" for redemption of 1,183.77 shares of Sentry at "HSBC BANK USA . . . New

York, NY . . . USA").

The Defendant's reply and oral arguments may point to an ambiguity in the available

evidence, which may present a difficulty for the Plaintiffs at a later stage of these proceedings.

However, the Court will, notwithstanding the Defendant's contrary presentation, resolve the

factual dispute in favor of the plaintiffs for purposes of evaluating a motion to dismiss for lack of personal jurisdiction.

The Plaintiffs have shown that the Defendant was able to use a foreign-based or a U.S.-based correspondent bank account for its redemption requests and, through its alleged agent, chose the latter.  *See* Margolin Decl. Ex. 18, ECF No. 1147 (Redemption Records); *see also* Joyce Decl. at 6–9, ECF No. 328.; *id.* at 11 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* at 12 ("Neither the fact that Fairfield Sentry was a U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* at 12–13 ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

This was no passive endeavor; the Plaintiffs allege that "UBS Jersey and the Citco Subscriber *frequently* used U.S. correspondent accounts in transacting with Sentry."  Opp'n at 31, ECF No. 1146 (emphasis in original).  Defendant did so repeatedly, authorizing its agent to use U.S.-based accounts for fourteen subscription and redemption payments, eventually redeeming nearly $7 million.  *Id.* at 3, 31–32.  Defendant, through its agent, selected and used a correspondent account at HSBC Bank USA in New York to receive nine redemption payments

from Sentry.  *Id.*; Margolin Decl. Ex. 18 (Redemption Records).  UBS Jersey accomplished the

conduct at the heart of the Liquidators' claims through its use of U.S.-based accounts.  The

Second Circuit has found the selection and repeated use of in-forum correspondent accounts to

perpetrate the alleged violations supports a finding of sufficient minimum contacts.  *Licci ex rel*

*Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013).

      UBS Jersey argues that any use of correspondent accounts that may have occurred was

incidental and insufficiently related to the harm for which the plaintiffs seek redress.  Reply at

15–16, ECF No. 1253.  The Second Circuit has determined that allegations of a "foreign bank's

repeated use of a correspondent account in New York on behalf of a client . . . show purposeful

availment of New York's dependable and transparent banking system, the dollar as a stable and

fungible currency, and the predictable jurisdictional and commercial law of New York and the

United States."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir.

2013) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900

(2012)); *see also Spetner*, 70 F.4th at 640 ("[A] defendant foreign bank's 'repeated use of a

correspondent account in New York on behalf of a client . . . can constitute transacting business

for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum."). [16]  A

course of dealing can be established through as little as "14 currency exchange transactions

between" two foreign entities made to a New York bank.  *Al Rushaid*, 28 N.Y.3d at 325.

      The Liquidators' allegations and evidence show the Defendant's use of U.S.-based

accounts for up to fourteen subscription and redemption payments over a five-year period.  *See*

Opp'n at 31–32; *see also* Margolin Decl. Ex. 18 (Redemption Records).  The subscription and

---

[16]    Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant
for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an
agent."  70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

redemption forms show that Defendant's purported agent, the Citco Subscriber, designated the U.S.-based correspondent bank, to which Sentry accordingly sent the relevant payments. The repeated use of New York-based correspondent accounts, while foreign options existed, demonstrates Defendant's purposeful availment of the banking system of the United States.

UBS Jersey argues that there can be no allegation of repeated "recurring" usage where "each redemption is its own claim." Reply at 15, ECF No. 1253. UBS Jersey relies on *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167 (Bankr. S.D.N.Y. 2018) and *Taormina v. Thrifty Car Rental*, No. 16-CV-3255 (VEC), 2016 WL 7392214 (S.D.N.Y. Dec. 21, 2016) to argue that the Plaintiffs must independently establish the Court's exercise of jurisdiction over each of the redemption payments. Mem. L. at 11; Reply at 15; 594 B.R. at 190 ("Each transfer is a separate claim, . . . and the Trustee must establish the court's jurisdiction with respect to each claim asserted."); 2016 WL 7392214, at *3 ("Because specific jurisdiction is claim-specific, a court must have specific jurisdiction over each of the Plaintiff's claims."); *see also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) ("A plaintiff must establish the court's jurisdiction with respect to each claim asserted."). Under Defendant's arguments, since the pertinent issue concerns a "single use with respect to any given claim," Plaintiffs would not be able to show repeated use of an account for any individual transfer. Hr'g Tr. 74:1–2, ECF No. 1352; *see also* Hr'g Tr. at 72:25–73:3 ("[I]f each redemption is a separate claim, we're not talking about repeated uses of the wires, we're talking about single uses of the [wires]").

However, it is not the quantity of transactions, standing by itself, that the Court considers in the jurisdictional analysis. The Second Circuit explained in *Licci*, 732 F.3d 161, that "both the frequency and deliberate nature" of a defendant's use of correspondent accounts determines whether the conduct shows purposeful availment. *Licci*, 732 F.3d at 168; *id.* at 171 (

"[Defendant] deliberately chose to process the many . . . wire transfers through AmEx in New York . . . . *Moreover*, [defendant]'s use of a correspondent account in New York to accomplish its dollar-denominated wire transfers was recurring.") (emphasis added). The number of repeated uses of a U.S. account is relevant to the jurisdictional analysis either to show the deliberate nature of that use or in conjunction with the deliberate nature of that use. *See id.* This Court has already stated that a single deliberate selection and use of a U.S.-based account can sufficiently demonstrate a defendant's purposeful availment of the banking system of New York and the United States. *See Fairfield Sentry Ltd. v. BNP Paribas Sec. Servs. (In re Fairfield Sentry Ltd.)*, Adv. Pro. No. 10-03627 (JPM), 2024 WL 3024512, at *10 (Bankr. S.D.N.Y. June 14, 2024).

Furthermore, the Second Circuit has stated that a court may consider contacts that "may not have directly given rise to the plaintiff's cause of action, [but] certainly 'relate to' it. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 (1985)). The repeated uses of a U.S.-based correspondent account by the Defendant may underlie separate claims; the uses also relate to each other.

The Liquidators have provided support for the allegation that Defendant chose to use a U.S. correspondent account to receive a payment from Sentry. Opp'n at 11–12, ECF No. 1146; Molton Decl. Ex. 18, ECF No. 1147 (Redemption Records); *see also* Joyce Decl. 8–9 (demonstrating the availability of foreign banks during the relevant period). The redemption forms show that Defendant designated the U.S.-based correspondent bank, to which Sentry accordingly sent the relevant payment. UBS Jersey is alleged to have received over $4 million through these transaction, demonstrating its purposeful availment of the banking system of New

York and the United States.  Defendant chose to use New York-based accounts while foreign
options existed.

### 2.  Defendant's Business Contacts with the Forum

The Liquidators assert that UBS Jersey "intentionally invested in BLMIS feeder fund
Sentry, while knowing through its agent, that Sentry was designed to subsequently invest that
money in New York-based BLMIS.  UBS Jersey is subject to this Court's jurisdiction with
respect to its Sentry redemptions as a result of that conduct."  Opp'n at 20–21, ECF No. 1146.
Defendant describes the allegations that the Citco Subscriber made subscription payments on
behalf of beneficial shareholders such as UBS Jersey while knowing that those payments would
be invested in BLMIS in New York as the unilateral activity of a third-party, which Defendant
argues is not appropriate to consider under *Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408, 417 (1984).  *See* Mem. L. at 16, ECF No. 854.

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at
regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a
nonresident corporation in a cause of action not related to those purchase transactions."
*Helicopteros*, 466 U.S. at 418.  The Supreme Court found that "one trip" to the forum "for the
purpose of negotiating the transportation-services contract . . . cannot be described or regarded as
a contact of a 'continuous and systematic' nature . . . ."  *Id.* at 416.  The Liquidators, however,
have described more substantial contacts here.

First, the Liquidators point to the documents given to UBS Jersey's agent, the Citco
Subscriber, by FGG, prior to and during the period when UBS Jersey subscribed to Sentry.
Opp'n at 6, ECF No. 1146 (citing Margolin Decl. Exs. 4–5).  The July 2000 memoranda
describes Sentry's dependence upon BLMIS in a section labeled "TRADING RISKS."  Margolin

Decl. Ex. 4 at 18, ECF No. 1147 ("The services of Messrs. Tucker and Noel and Bernard L.

Madoff Investment Securities are essential to the continued operations of [Fairfield Greenwich

Limited]. If any of their services were no longer available, their absence would have an adverse

impact upon an investment in [Sentry]. [Fairfield Greenwich Limited] has delegated all

investment management duties to [BLMIS].").  This memorandum also describes the business

objective of the company "seek[ing] to achieve capital appreciation of its assets by allocating its

assets to an account at [BLMIS], a registered broker-dealer in New York, which employs an

options trading strategy described as 'split strike conversion'."  *Id.* at -948; *see also id.* Ex. 5 at -

410_15.  The January 2004 memorandum made clear that BLMIS had "approximately 95% of

[Sentry]'s assets under custody."  *Id.* Ex. 5 at -410_22.[17]  The memorandum also explained that

investing in Sentry would require a wire transfer of funds to Sentry's account at HSBC Bank

USA in New York.  *Id.* Ex. 5 at -956.  These documents show that Defendant, through its agent,

was aware at the time that its investments in Sentry were effectively investments in BLMIS in

New York.  UBS Jersey, through its agent, executed subscriptions into Sentry with this

knowledge.  *See id.* Ex. 7 (August 2002 Subscription Confirmation); *Id.* Ex. 8–10 ( March

through November 2004 Sentry Subscription Request).

     UBS Jersey states that, while the subscription agreements contain forum selection clauses

specifying New York for claims relating to subscriptions, there is no similar clause subjecting

---

[17]    Many of UBS Jersey's investments in Sentry predate its receipt of the January 2004 private placement
memorandum. *See* Margolin Decl. Ex. 19 (October 2001 through January 2008 subscription and transfer records).
Specific information contained only in this 2004 memorandum thus might apply only to subscriptions that were
made after Defendant received it.  However, UBS Jersey received a memorandum in 2000 that provided similar
information.  *See, e.g., id.* Ex. 4 at -952 ("[Fairfield Greenwich Limited] has delegated the management of the
Company's investment activities to Bernard L. Madoff Investment Securities . . . in New York . . . ."); *id.* at -953
(describing the investment policies of Sentry as making use of BLMIS's "split strike conversion" strategy); *id.* at
-954 (describing limited investments beyond those with BLMIS); *id.* at -960 (describing Sentry's dependance on
BLMIS); *id.* at -962 ("The Company allocates its assets to an account at Bernard L. Madoff Investment Securities . .
. ."). Furthermore, any specific information that was initially gained by UBS Jersey in 2004 may relate to its
knowledge at the time it received payments for redeeming shares on investments made prior to 2004.

any party to jurisdiction in New York for claims relating to redemptions.  Reply at 4, ECF No.

1253.  The Defendant argues that the "absence of such clauses relating to redemptions shows the

parties intent *not* to subject themselves to jurisdiction in New York for purposes *other than*

subscriptions." *Id.* (emphasis in original).  In August 2018, this Court held that it does not have

personal jurisdiction over certain defendants due to subscription agreements that provided for

consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement

and the Fund."  *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6,

2018).  The Liquidators here rely on the subscription agreements and private placement

memoranda not to show consent, but to show that when Defendant invested in Sentry it did so

knowing that it would avail itself of the benefits and protections of New York.  Opp'n at 21–26,

ECF No. 1146.  The absence of any similar clauses in redemption documents does not invalidate

the import of the forum selection clauses for these purposes.  The subscription agreements,

signed by the Citco Subscriber[18] as an agent of UBS Jersey, in this way, support the Plaintiffs'

showing of contacts with the forum.  *See* Margolin Decl. Exs. 3, 8–10, ECF No. 1147.

Unlike in many other, related Fairfield proceedings, the Liquidators have not here

supplied evidence of emails or meetings between the Defendant and any Fairfield- or BLMIS-

related individuals in the forum.  *See, e.g., Fairfield Sentry Ltd. v. UBS Eur. SE, Lux. Branch (In*

*re Fairfield Sentry)*, 658 B.R. 257, 273 (Bankr. S.D.N.Y. 2024). Nevertheless, the evidence

provided by the Plaintiffs of the Defendant's subscriptions and investments in and redemptions

from Sentry demonstrates more than mere purchases or a one-time visit to the forum.  The

---

[18]    The long form subscription agreement produced by UBS Jersey in discovery was signed by Citco Bank and registered the shares in the name of "Citco Global Custody N.V. Ref UBS Jersey."  Margolin Decl. Ex. 3 at -136, -140.  Three short form subscription agreements from March and November of 2004 identified Citco Global Custody with reference to UBS Jersey as the subscriber and the entity in whose name the shares were to be registered.  *Id.* Ex. 8  at -434–36, Ex. 9 at -904–06, Ex. 10 at -250–53.

Liquidators have demonstrated facts supporting continuous and systemic contacts with the forum.

**3.** **Whether the Defendant's Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction**

The Court will address UBS Jersey's remaining arguments that the alleged contacts are not jurisdictionally relevant under Supreme Court precedent.  Mem. L. at 16–18, ECF No. 854; Reply at 5–8, ECF No. 1253.  Defendant argues that the Plaintiffs' allegations amount to "mere knowledge that Sentry would invest money it raised in the BVI with BLMIS in New York," which it states is "insufficient as a matter of law to support jurisdiction" under *Walden v. Fiore*, 571 U.S. 277 (2014).  *Id.* at 12.

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Walden*, 571 U.S. at 289.  The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.*  As the Supreme Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's conduct . . . must form the necessary connection with the forum State." *Id.* at 285.  Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investments into BLMIS in New York and selection and use of U.S.-based correspondent accounts, as described above, demonstrate that UBS Jersey took affirmative actions on its own apart from the conduct of the Plaintiffs.  *See* Opp'n at 16–21, 31 ECF No. 1146.  The Liquidators have shown that the

Defendant knew and intended that, by investing in the Funds, Defendant's money would enter into U.S.-based BLMIS.  *Id.*; *see also* Margolin Decl. Exs. 4–5 (July 2000 and January 2004 Sentry private placement memoranda).  This certainty can be found in the Fairfield Funds' contractual obligation to invest at least 95% of the money they received in U.S.-based BLMIS.  *See id.* Ex. 5 at -410_16 ("The Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value, measured at the time of investment) to alternative investment opportunities other than its 'split strike conversion' investments . . . ."); *see also id.* Ex. 5 at 410_22 ("Currently BLM has approximately 95% of the Fund's assets under custody.").  Defendant benefited from the materials that it received from FGG which confirmed the investments would be made with BLMIS in New York.  *See id.*

The Court thus finds that Defendant's selection and use of U.S. correspondent accounts and due diligence concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong.  The contacts are not random, isolated, or fortuitous.  The contacts demonstrate UBS Jersey's purposeful activities aimed at New York in order to effectuate transfers from Sentry.  The Plaintiffs have thus provided allegations that sufficiently support a prima facie showing of jurisdiction over the Defendant.

**C.  <u>Whether the Claim Arises Out of or Relates to the Defendant's Forum Conduct</u>**

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original).  "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required.  *Id.* at 1027.  Instead, a court need only find "an

affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that regardless of whether the "subscription payments went through U.S. correspondent accounts, it would make no jurisdictional difference here because the Liquidators' claims do not arise out of or relate to subscriptions or UBS Jersey's alleged decision to invest in the Funds." Reply at 8, ECF No. 1253; *see also* Mem. L. at 17, ECF No. 854 (arguing that the claims relate to and arise out of the calculation of the NAV by Citco Fund Services and the redemption payments made on the basis of those calculations). However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated. Am. Compl. ¶¶ 173–74, 206–09, ECF No. 679. The issue of knowledge of the inflated NAV is inextricably tied to the Defendant's investments with New York-based BLMIS. The allegations are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds. *Id.* ¶¶ 173–74. The Defendant's contacts with the United States, in investing in and in communications with the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum. *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

**D.**  **Whether Assertion of Personal Jurisdiction is Reasonable**

If a defendant has sufficient minimum contacts, the Court must then ask "whether the

assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial

justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank*

*Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Where a plaintiff "makes the threshold

showing of the minimum contacts required for [exercising personal jurisdiction], a defendant

must present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3

(quoting *Bank Brussels Lambert*, 305 F.3d at 129).  Factors the Court will consider include the

burden on the defendant, the interests of the forum in adjudicating the case, the plaintiff's

interest in obtaining convenient and effective relief, the interstate judicial system's interest in

obtaining the most efficient resolution of controversies, and the shared interest of the states in

furthering fundamental substantive social policies.  305 F.3d at 129.

The Defendant argues that "[t]he United States has a minimal (if any) interest in this

litigation, which involves only foreign-law claims asserted as between exclusively foreign parties

relating to assets located overseas and business transacted overseas by investment Funds

organized under foreign law."  Mem. L. at 20, ECF No. 854 (citing *In re Fairfield Sentry Ltd.*,

458 B.R. 665, 682 (S.D.N.Y. 2011) (Preska, C.J.)).  UBS Jersey further argues that it would

"bear a heavy burden" by litigating in this Court as its home and "virtually [all] of the key

evidence and witnesses relevant to the Liquidators' claim" are "thousands of miles" away and in

another jurisdiction. *Id.*  Defendant suggests that a "desire to engage in forum shopping" may be

the reason for litigating the claims in this Court, as it may be more reasonable to litigate BVI-law claims with non-U.S. litigants in the BVI.  *Id.*

Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced.  In that case, the District Court determined whether the proceeding was core or non-core; it did not determine whether adjudication or jurisdiction in the United States was reasonable.  *See id.* at 675.  The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum. However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023).  Furthermore, UBS Jersey is represented by U.S. Counsel and the United States has a strong interest in ensuring the integrity of its financial systems.

Defendant has alleged that other forums may be able to hear the claims.  What it has not done is demonstrate how this forum would fail to provide effective relief.  *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3.  Defendant does not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction.  *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023).  The Defendant has not established that the Court's exercise of personal jurisdiction over it would be unreasonable.  The Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with

"traditional notions of fair play and substantial justice . . . ."  *See Int'l Shoe*, 326 U.S. at 316, 66

S. Ct. 154.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1(a).

**IT IS SO ORDERED.**


Dated: August 20, 2024
        New York, New York

/S/ John P. Mastando III
THE HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE