**UNITED STATES BANKRUPTCY COURT**      *FOR PUBLICATION*
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Fairfield Sentry Limited, et al.<br><br><br>                    Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 10-13164 (JPM)<br><br>(Jointly Administered) |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>ABN AMRO SCHWEIZ AG a/k/a AMRO (SWITZERLAND) AG, et al.,<br><br>                    Defendants. | <br><br><br><br>Adv. Pro. No. 10-03636 (JPM) |

## MEMORANDUM OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO DISMISS

*APPEARANCES:*

**O'MELVENY & MYERS LLP**
*Attorneys for Credit Suisse AG*
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
By:    William J. Sushon


**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs Joint Liquidators*
Seven Times Square
New York, NY 10036
By:    Jeffrey L. Jonas
       David J. Molton
       Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is the motion of Credit Suisse AG ("CSAG" or "Defendant," sued as Credit Suisse AG Zurich), to dismiss the Fifth Amended Complaint (the "Amended Complaint") for lack of personal jurisdiction. Mot. to Dismiss, ECF[1] No. 829 (the "Motion"). The Court held a hearing on the Motion to Dismiss on September 24, 2024 (the "Hearing"). For the reasons set forth herein, the Court DENIES the Defendant's Motion to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). This Court previously concluded that it has subject matter jurisdiction over this and related actions. *See In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*"); *see also* Stip. Order, ECF No. 577. Personal jurisdiction is contested by the Defendant and will be discussed below.

## III.    BACKGROUND

This adversary proceeding was filed on September 21, 2010. Compl., ECF No. 1. Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry"), Fairfield Sigma Limited (In Liquidation) ("Sigma"), and Fairfield Lambda Limited (In Liquidation) ("Lambda" and, together with Sentry and Sigma, the "Fairfield Funds") filed the Amended Complaint on August 12, 2021. Am. Compl., ECF No. 679. Via the Amended

---

[1]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03636-jpm unless otherwise noted.

Complaint, the Liquidators seek the imposition of a constructive trust and recovery of over $1.7 billion in redemption payments made by Sentry, Sigma, and Lambda to various entities known as the Citco Subscribers.  *Id.* ¶¶ 1–2, 205–06; *id.* Exs. A–C.[2]  Of that amount, Defendant allegedly received over $3.93 million[3] through redemption payments from its investment in Sentry and Sigma.  Opp'n at 1, ECF No. 1156; Declaration of Joshua Margolin in Support of the Liquidator's Opposition ("Margolin Decl.") Exs. 50-59, 73, 76, 78, 80, 82, 84, 86, 88, ECF No. 1157 (Citco, Sentry, and Sigma Redemption Records).

## A. <u>The BLMIS Ponzi Scheme</u>

This adversary proceeding arises out of the decades-long effort to recover assets of the Bernard L. Madoff Investment Securities LLC ("<u>BLMIS</u>") Ponzi scheme.[4]  Am. Compl. ¶ 1.  The Citco Subscribers allegedly invested, either for their own account or for the account of others, into several funds — including Sentry, Sigma, and Lambda — that channeled investments into BLMIS. *Id.* ¶¶ 2, 5, 15.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 133–34;

---

[2]     At the time of the filing of the Amended Complaint, the Plaintiffs made no specific allegations as to the exact amounts received by any of the beneficial shareholders.  With respect to CSAG, the Amended Complaint states in relevant part that "[b]ased on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Credit Suisse AG Zurich."  Am. Compl. ¶ 64.  The Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers.  *Id.* ¶¶ 34–112.  This opinion concerns only those payments that the Plaintiffs allege were paid to CSAG.

[3]     Of that total U.S. Dollar amount, the Plaintiffs allege that CSAG "received $3,660,208.01 from Sentry and approximately €217,925.49 from Sigma through the redemption payments at issue.  [T]he Liquidators have applied the exchange rate as of the date of each redemption payment out of Sigma and calculated the dollar value of the Sigma redemptions to be approximately $278,095.83.  This number may vary if the Court ultimately determines that a different exchange rate applies."  Opp'n at 1 n.2, ECF No. 1156.

[4]     The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that scheme have been recounted by many courts.  *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

*see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund — what Madoff Securities advertised its funds to be — pools investments from multiple feeder funds and then invests the money."). Fairfield Sigma and Lambda, in contrast, were indirect feeder funds, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currencies. Am. Compl. ¶¶ 133–34. BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme. *Id.* ¶¶ 5–7, 13. Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart. *Id.* ¶¶ 7–8, 12–14, 134.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV"). *Id.* ¶ 7. The Citco Subscribers and the beneficial shareholders were allegedly such investors. *Id.* To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 136. In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 137. The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id.* The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares. *Id.* ¶ 139. The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments. *Id.*

CSAG is organized under the laws of Switzerland with a registered address in Zurich, Switzerland. *Id.* ¶ 64. CSAG allegedly invested into and redeemed shares of the Fairfield Funds

through Citco Bank Nederland N.V. ("Citco Bank") and Citco Global Custody N.V. ("Citco Global Custody"). [5] Opp'n at 5, ECF No. 1156.

Citco Bank and Citco Global Custody were organized under the laws of either Curaçao or the Netherlands. Mem. L. at 6 n.10, ECF No. 830. CSAG invested in Sentry and Sigma as early as 2001 via Citco Bank and Citco Global Custody (the "Citco Subscriber"), which is alleged to have facilitated investments in the Fairfield Funds for numerous shareholders in this proceeding. Opp'n at 6. CSAG opened an account at Citco Bank to receive subscription payments from and make redemption payments to subscribers of the Fairfield Funds. Opp'n at 10. CSAG allegedly retained the Citco Subscriber as its agent when it entered into a brokerage and custody agreement (the "B&C Agreement") as early as September 2001. *Id.*; Margolin Decl. Ex. 48, ECF No. 1157 (Sept. 2001 B&C Agreement). The B&C Agreement authorized Citco Bank to provide "Brokerage Services," defined to include "the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of and for the account of" either CSAG, Citco Bank, or Citco Global Custody, and "any services ancillary thereto as set out in this Agreement." Margolin Ex. 48 at -053–54.

From November 2001 through November 2008, CSAG allegedly subscribed through the Citco Subscriber for 42,741.31 shares of Sentry and Sigma. Opp'n at 6. CSAG, through the Citco Subscriber, redeemed a total of $3,939,723.22 worth of shares from Sentry and Sigma from August 2004 through November 2008. Opp'n at 12. In addition to these redemption payments, CSAG allegedly received fees from the clients on whose behalf it invested and required the clients to pay

---

[5]     The Plaintiffs' opposition memorandum describes these two Citco entities as a single collective entity, defined as the "Citco Subscriber." Opp'n at 10 n.13, ECF No. 1156. The Amended Complaint refers to the "Citco Subscribers," a term that is defined to include both Citco Bank and Citco Global Custody, as relevant to this motion, and other Citco banking and custody entities. *See* Am. Compl. ¶ 8 (defining the Citco Subscribers to include "Citco Global Custody NV, Citco Global Custody (NA) NV, Citco Fund Services (BVI), and Citco Fund Services (Europe) BV . . . the Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch (a wholly owned subsidiary of Citco Bank Nederland N.V.) or the Citco Banking Corporation N.V.").

additional fees relating to any transactions involving the Funds. *Id.* at 12–13. At the directions and instructions of the Citco Subscriber, as the purported agent for CSAG, "some . . . of the Redemption Payments were received at . . . designated United States-based bank accounts." Am. Compl. ¶ 141.

Bernard Madoff was arrested for alleged violations of federal securities laws on December 11, 2008. *Id.* ¶ 193. The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme. *Id.* On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 194. In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 195–96. Madoff was sentenced to 150 years in federal prison and died in April 2021. *Id.* ¶ 197.

The Amended Complaint alleges that the Citco Subscribers, including the purported agents of CSAG, "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made. *Id.* ¶ 209. The Amended Complaint further asserts that, while receiving redemption payments, the Citco Subscribers "uncovered multiple additional indicia that Madoff was engaged in some form of fraud" but "turned a blind eye, [and] accept[ed] millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the law of the British Virgin Islands . . . ." *Id.* ¶¶ 8, 209. These indicia included verification that there was no "independent confirmation that BLMIS-held assets even existed," Madoff's failure to segregate duties, and BLMIS's "employing an implausibly small auditing firm" rather than a reliable auditor. *Id.* ¶¶ 9, 209. In the face of red flags such as these, the Citco Subscribers and other Citco entities purportedly "quietly reduced

[their] own exposure to BLMIS through the Funds, and significantly increase[ed] [their] Custodian fees to offset the risk." *Id.* ¶ 209.

### B. The Prior Litigation and Procedural History

The Fairfield Funds were put into liquidation in the BVI in 2009. *Id.* ¶¶ 26–29. The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 29. Pursuant to the appointment order of the BVI court,[6] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 203. The Liquidators commenced actions in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme. Mem. L. at 4, ECF No. 830; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings. Am. Compl. ¶ 30, ECF No. 679. This Court granted that recognition on July 22, 2010. *Id.* All cases filed by the Plaintiffs were administratively consolidated before this Court in November 2010. *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

The Plaintiffs asserted multiple causes of action in those consolidated adversary proceedings including, *inter alia*, mistaken payment and constructive trust.[7] Compl. ¶¶ 63–86,

---

[6]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See* Am. Compl. at 1.

[7]    Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the implied covenant of good faith and fair dealing. *See Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at 463.

ECF No. 8; *see also* 630 F. Supp. 3d at 479.   In October 2011, this Court stayed the U.S. proceedings pending resolution of the BVI proceedings.   *See* Am. Order Staying Redeemer Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *Fairfield I*, 2018 WL 3756343, at *3.

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for restitution based on mistaken payment.  *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014] UKPC 9 ("*Migani* ").[8]   The Privy Council held that the Plaintiffs' claims for restitution in the BVI to recover redemption payments arising out of transactions governed by the Funds' Articles of Association are governed by BVI law.  *Id.* ¶ 17.   The Plaintiffs' claims to recover redemption payments thus depended on whether Sentry was bound to make those payments under the "true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption."  *Id.* ¶ 19.   The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption.  *Id.* ¶ 21.   The redemption payments made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken.  *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates.  *See Fairfield I*, 2018 WL 3756343, at *5–6. Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time.  *See id.* at *6.   The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith.  *Id.*

---

[8]      *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL 1219748.

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295. Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called "Knowledge Defendants" to proceed. *Id.* at 301 ("The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust."). In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022). The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. Mot. to Amend, ECF No. 618; Mot. to Amend, Adv. Pro. No. 10-03496, ECF No. 3737. On August 5, 2021, this Court granted the motion to amend the complaint and lifted the stay of the redeemer actions. Order Granting Mot. to Amend, ECF No. 676; Order Lifting Stay of Redeemer Actions, ECF No. 675.

**C.  <u>The Pending Motion</u>**

The Amended Complaint seeks the imposition of a constructive trust on the redemption payments received from the Fairfield Funds. *See* Am. Compl. ¶ 205, ECF No. 679.  The Amended Complaint alleges that Defendant's purported agent, the Citco Subscriber, had knowledge of the fraud at BLMIS and therefore knowledge that the NAV was inflated. *Id.* ¶ 209.  "By reason of their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been unjustly enriched to the detriment of the [Fairfield] Funds and other shareholders and creditors of the Funds." [9] *Id.* ¶ 213.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id.* ¶ 206 (citing 596 B.R. at 293).  As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and third, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.'

*Fairfield IV*, 2021 WL 771677, at *3  (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the defendants, including CSAG as a beneficial shareholder of certain accounts, purposefully availed themselves of the laws of the United States and the State of New York by "investing money with the Funds, and knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS."  Am. Compl. ¶ 20, ECF No. 679.

---

[9]    As stated *supra*, footnote 2, the Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers.  *Id.* ¶¶ 34–112.

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022. *See* Scheduling Order, ECF No. 714; Second Am. Scheduling Order, ECF No. 997. Merits document and expert discovery is ongoing in this case. *See* Fourteenth Am. Scheduling Order, ECF No. 1321; Fifteenth Am. Scheduling Order, ECF No. 1336.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 1–3; 19, ECF No. 830.

The Liquidators filed an opposition to the Motion and submitted the declarations of Joshua Margolin and Sara Joyce in support of their opposition. *See* Opp'n, ECF No. 1156; Margolin Decl., ECF No. 1157; Declaration of Sara Joyce ("<u>Joyce Decl.</u>"), ECF No. 1158.[10] The Liquidators argue that exercising jurisdiction over Defendant would be reasonable and that Defendant's contacts with the United States, through its own actions and those of its purported agent, in knowingly and intentionally investing in Sentry, using U.S. correspondent accounts to invest in and receive payments from Sentry, and conducting other business activities support personal jurisdiction. *See* Opp'n at 2–4, ECF No. 1156. Defendant filed a reply memorandum on August 14, 2023. *See* Reply, ECF No. 1283. This Court reviewed the above filings and held a hearing on the Motion on September 24, 2024. *See* Hr'g Tr., ECF No. 1369.

---

[10]    Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal. At the Hearing on the motion, the Court gave the parties the opportunity to withdraw from the record any previously-sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the opinion. *See* Hr'g Tr. 20:12–19, ECF No. 1369. None of the parties in this matter requested information withdrawn. The Court will nevertheless refrain from referring to any bank account numbers or names of individual employees, named only in sealed documents, in full.

## IV.    DISCUSSION

### A. The Law of Personal Jurisdiction

In order to subject a defendant to personal jurisdiction in the United States, due process requires that the defendant have sufficient minimum contacts with the forum in which the defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In adversary proceedings, courts must determine whether the defendant has minimum contacts with the United States, rather than with the forum state." *Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)). "When jurisdiction is satisfied through Bankruptcy Rule 7004,[11] a bankruptcy court need not address its state's long-arm statute." *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted). There are three conditions necessary for the Court to exercise specific jurisdiction[12] over the non-resident defendant:

---

[11]    "The summons and complaint and all other process except a subpoena may be served anywhere in the United States." Fed. R. Bankr. P. 7004(d). A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States." Fed. R. Bankr. P. 7004(f).

[12]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction. A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). The Plaintiffs do not

First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2), the Plaintiffs "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Following discovery, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball*, 902 F.2d at 197. "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (citing *Dorchester Fin. Sec.*, 722 F.3d at 85). "Now that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy." *Id.* at *6. "Plaintiffs need only show that their prima facie showing of jurisdiction is factually supported."

_____

allege that the Court has general jurisdiction over Defendant. *See* Opp'n at 3–4, ECF No. 1156 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

*Id.* at \*6.  When considering a motion to dismiss after jurisdictional discovery has taken place, "the court must 'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual disputes, in the plaintiff's favor." *Id.* at \*4 (quoting *Ball*, 902 F.2d at 197).

### B.  <u>Analysis of Purposeful Availment</u>

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)).  For specific personal jurisdiction, "'[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the forum.'" *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)).  "Although a defendant's contacts with the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*, 571 U.S. at 134) (alteration in original).  "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

CSAG asserts that the "Liquidators recently confirmed that the Redemption Payments transpired entirely outside of the United States in their opening appellate brief to the District Court challenging certain of Judge Bernstein's holdings in *Fairfield I*, *Fairfield II*, and *Fairfield III*."

Mem. L. at 15–16, ECF No. 830.  The Plaintiffs argued before the District Court that "every

relevant component of the transactions at issue here occurred outside the territorial jurisdiction of

the United States."  Reply at 3, ECF No. 1283; *see also* Pls.-Appellants' Opening Br. for Second

Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July

21, 2021), ECF No. 440 (the "Opening Brief").  The Plaintiffs' Opening Brief concerned the

extraterritorial application of the § 546(e)[13] safe harbor.  *See* Opening Brief at 24 (arguing that the

"Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially

to shield from avoidance settled securities transactions that occurred exclusively outside the United

States.").

     As another bankruptcy court in this district has stated, the "tests for personal jurisdiction

and extraterritoriality are not the same."  *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am.*

*Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017).  In *Spizz*, the bankruptcy court was

able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided"

under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of,

and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may

be "subject to specific personal jurisdiction."  *Id.* at 613–14.

     By arguing in the District Court that the redemption transfers were foreign for purposes of

extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for

purposes of personal jurisdiction.  To determine whether a transaction is foreign or domestic for

analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant

---

[13]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment
or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant,
stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or
to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial
participant, or securities clearing agency, in connection with a securities contract. . . ."  11 U.S.C. § 546(e).  "By its
terms, the safe harbor is a defense to the avoidance of the *initial* transfer."  *Picard v. BNP Paribas S.A. (In re BLMIS)*,
594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

### 1.  Whether CSAG is the Correct Entity to be Named as a Defendant

The Court will first address the threshold issue of whether CSAG is a proper party to this dispute. The Plaintiffs allege that CSAG is the proper defendant in this adversary action because certain redemption transaction documents refer to "CSAG's reference number within Citco Global Custody: 190071." Opp'n. at 6, n. 10, ECF No. 1156. The Plaintiffs further cite as evidence the B&C Agreement and a July 2004 Citco Bank redemption request, which show the account reference number is associated with Credit Suisse. *See id.* (citing Margolin Decl. Exs. 48 & 51, ECF No. 1157). However, the Defendant argue in response that the Plaintiffs' evidence only links the redemption transactions to Credit Suisse, but not CSAG specifically, and is thus insufficient to show that CSAG is a properly named defendant in this adversary action. *See* Reply at 3–5, ECF No. 1283.

The Second Circuit has made clear that courts evaluating a motion to dismiss for lack of jurisdiction "will not draw 'argumentative inferences' in the plaintiff's favor." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (quoting *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir.1992) (citing, in turn, *Norton v. Larney*, 266 U.S. 511, 515, 45 S. Ct. 145, 147, 69 L. Ed. 413 (1925))). If allegations sufficient to sustain a court's exercise of jurisdiction do not "appear by the allegations of the bill or complaint, the trial court, upon having its attention called to the defect or upon discovering it, must dismiss the case,

unless the jurisdictional facts be supplied by amendment. *Norton v. Larney*, 266 U.S. at 515–16. The Court will "however, construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d at 507 (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 106 S. Ct. 1922, 1923–24, 90 L. Ed. 2d 413 (1986); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993)). Further, where there exist "conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)) (quotation marks omitted in original). Thus, while the Court will not infer support for Plaintiffs' arguments notwithstanding contrary allegations or a lack of allegations, it is appropriate to resolve factual disputes in their favor.

The Defendant alleges here that the Plaintiffs' purported evidence does not specifically associate CSAG with the Citco account reference number, as the documents the Plaintiffs cite to only show the account was opened and maintained by "Credit Suisse First Boston," and the "[u]nderlying customer" is "Credit Suisse." Reply at 4, ECF No. 1283. CSAG also alleges that "the vast bulk of the evidence the Plaintiffs submit concerns [Credit Suisse London Nominees ("CSLN")], not CSAG," and argues that the Plaintiffs "conflate CSLN with CSAG…" *Id.* at 3.[14] The Defendant thus argues that "there is at best conflicting evidence as to what [the reference

---

[14]    CSLN is not a defendant in this proceeding, and the Plaintiffs had voluntarily dismissed their claims against CSLN in 2010 in another adversary action. *See id.* at n.12; *see also* Stipulation of Discontinuance: Notice of Voluntary Discontinuance, *Fairfield Sentry Ltd. v. Credit Suisse London Nominees*, Case No. 650280/2010 (N.Y. Sup. Ct. 2010).

number] means[,]" and the Amended Complaint must be dismissed with respect to CSAG, as the Plaintiffs have not carried their burden in "showing that those [redemption] transactions belong to CSAG." Hr'g Tr. 9: 13–16, ECF No. 1369.

In their response, the Plaintiffs maintain that they have produced sufficient evidence to link CSAG to the numerous redemption transactions. The Plaintiffs first argue it is immaterial that the B&C Agreement and the various Citco redemption requests do not directly refer to CSAG as the entity that received the redemption payments, as the Defendant does not dispute its investments in the Fairfield Funds. *See id.* at 16: 4–12; *see also* Reply at 6 ("CSAG invested in the Funds…"). The Plaintiffs further allege that CSAG is indirectly identified in certain subscription materials, notwithstanding that those documents also contain direct references to CSLN. *See* Hr'g Tr. 17: 9–24; *see also* Margolin Decl. Ex. 92 at -409, -410, ECF No. 1157 (subscription records showing CSAG's registered address as a mailing address and listing an unspecified Credit Suisse entity with that same address as a counterparty to a Sentry Subscription Agreement).

While the parties present conflicting factual allegations on this issue, the Court finds that the Plaintiffs have submitted sufficient evidence that CSAG may be a relevant party to the Fairfield Funds redemption transactions. Specifically, the Court finds it significant that the Defendant admits to its investment in the Funds, and that some Sentry subscription materials refer to CSAG's registered address. Indeed, if such facts were "credited by the ultimate trier of fact, [those facts] would suffice to establish jurisdiction over the defendant." *Terrorist Attacks on September 11, 2001*, 714 F.3d at 673 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir.2010)). This remains true, even though the transaction records do not explicitly identify CSAG as a party in the various redemption transactions. Therefore, the Liquidators have sufficiently demonstrated at this stage that CSAG may be named as a defendant in this action.

## 2.  Whether the Citco Subscribers Were CSAG's Agents

The Defendant next argues briefly that the Citco Subscribers were not agents of CSAG, and Citco's contacts with the U.S. cannot be imputed to CSAG.  The Defendant cited the Court's ruling in *Fairfield III*, 2020 WL 7345988 at *7 that "the Funds were customers of Citco Bank," and that Citco Bank "acted as their agents in connection with the securities contracts [related] to the redemption payments …" as support for this argument.  *See* Reply at 8 ("the Funds — not CSAG or other Fund subscribers — were customers of Citco Bank …") (emphasis in original and internal quotation marks omitted).  Although the Plaintiffs did not respond to this argument, the Court will address this issue here.

CSAG apparently assumed that a party cannot be agents of multiple parties.  Under this argument, CSAG asserts that, because the Court had found that the Citco Subscribers were the Funds' agent in facilitating the redemption payments, the Citco Subscribers could not simultaneously be agents of other parties in the same transactions.  The Court disagrees.  Many courts have long recognized that, where two principals to the same transaction do not have conflicting interests, a third-party may serve as an agent for both principals.  *See, e.g., 99 Commercial Street, Inc. v. Goldberg*, 811 F.Supp. 900 (S.D.N.Y. 1993) (holding that an escrow agent can act as agent to both parties); *see also Knudson v. Weeks*, 394 F.Supp. 963 (W.D. Okla. 1975) (holding that an agent may act as an agent for both parties to the same transaction where the interest of two principals are not conflicting).  Accordingly, the Court's holding in *Fairfield III* establishing the agency relationship between the Funds and the Citco Subscribers does not necessarily bar the Plaintiffs' allegation the Citco Subscribers served as CSAG's agent with respect to the redemption payments.  Since the Defendant does not provide any further support for this argument, the Court also resolves this dispute in the Plaintiffs' favor here.

### 3. __Defendant's Use of Correspondent Accounts__

The Plaintiffs point to the choice and use of correspondent accounts by CSAG and its purported agent as sufficient to establish minimum contacts with the United States. Opp'n at 28–31, ECF No. 1156. "Correspondent accounts are accounts in domestic banks held in the name of foreign financial institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)). Plaintiffs allege that CSAG, through the Citco Subscriber, its purported agent, deliberately selected and repeatedly used U.S. correspondent accounts to effectuate the redemption payments that form the harms for which Plaintiffs seek redress. Opp'n at 28–30.

Defendant argues that "the Redemption Payments occurred, by design, entirely outside the United States." Mem. L. at 14, ECF No. 830. CSAG believes that the Plaintiffs own allegations show that "the Redemption Payments were paid to accounts outside the United States . . . ." *Id.* at 13. CSAG points first to the Amended Complaint, in which the Plaintiffs stated that the B&C Agreement required CSAG and all other beneficial shareholders to "*maintain bank accounts with the Citco Banks outside of the United States, into which all Redemption payments were deposited.*" *Id.* at 7–8. (emphasis in original). CSAG further points to the redemption payment records from the Funds — attached to the Amended Complaint as Exhibits A, B, & C — which state that the redemption payments at issue here were made to a bank account labeled "Citco Global Custody (NA) NV, *Netherlands*." *Id.* at 9 (emphasis in original). CSAG also argues that Sentry required "the transaction be executed in U.S. Dollars[,]" and CSAG "had no choice over the account sending the redemption payments." Reply at 11, ECF No. 1283. As such, CSAG believes that the fact that the Sentry subscriptions and redemptions could have been accomplished outside of the

U.S. Banking system using another currency, is "not evidence that *CSAG* deliberately chose to [have the redemptions occur through the U.S. banking system]." *Id.* at 9. (emphasis in original).

The first step to redeem a share of Sentry was for CSAG to submit a redemption request to the Citco Subscriber. Opp'n at 10–11, ECF No. 1156. The Citco Subscriber from whom CSAG requested redemptions would then submit a request on CSAG's behalf to the investment manager of Sentry, the Fairfield Greenwich Group ("FGG"). Opp'n at 11; *see, e.g.,* Margolin Decl. Ex. 51 at -538 (July 1, 2004, Citco Bank redemption request to FGG for redemption of 44.08 shares of Sentry). This redemption request that the Citco Subscriber sent to FGG would state the bank and account to which the Citco Subscriber requested FGG send the redemption payments. *See, e.g.,* Margolin Decl. Ex. 51 at -538 ("WE REQUEST YOU TO WIRE THE REDEMPTION PROCEEDS IN USD TO THE . . . ACCOUNT . . . OF CITCO BANK NEDERLAND N.V. WITH HSBC BANK USA 452 FIFTH AVENUE NEW YORK, NY 10018 UNITED STATES . . . .").

The Plaintiffs have submitted evidence showing the Citco Subscriber, on behalf of Defendant, repeatedly instructed redemptions of Sentry shares be sent to an account in the United States. *See id.* Ex. 84 at -175 (Confirmation of Order Received for 10 shares of Sentry delivered to HSBC Bank USA in New York with settlement date of July 1, 2007); *id.* at -736 (record of redemption of 30.73 shares of Sentry as valued on October 31, 2007, requested to be sent to Citco Bank's account at HSBC Bank USA in New York); *see also id.* Ex. 80 at -289, -308, -317, -041 (records of redemptions of redemption payments for shares of Sentry to be sent to Citco Bank's account at HSBC Bank USA in New York).

As mentioned, while the Court will not "draw argumentative inferences in the [Plaintiffs'] favor — consistent with the Second Circuit's holding in *Overseas Mil. Sales Corp.*, 21 F.3d at 507. — it is appropriate to resolve factual disputes in the Plaintiffs' favor. *See In re Terrorist Attacks*

*on Sept. 11, 2001*, 714 F.3d at 673 ("If the parties present conflicting affidavits, all factual disputes

are resolved in the plaintiff's favor…").

The Plaintiffs allege that Defendant received over a seven-year period eighteen redemption

payments from Sentry that passed through U.S. correspondent accounts.  Opp'n at 31, ECF No.

1156.  Following jurisdictional discovery, Plaintiffs provided support for each of these payments

with the corresponding Requests, and they all reflect routing of Redemption Payments to a New

York account.  *See, e.g.*, Margolin Decl. Ex. 82 at -174, ECF No, 1157 (April 20, 2006, request

for redemption of 218.19 shares to be made to "HSBC BANK USA . . . NEW YORK, NY . . .

UNITED STATES OF AMERICA") and *id.* at -548 (April 25, 2004, "Confirmation of Order

Received" for redemption of 218.19 shares of Sentry at "HSBC BANK USA . . . New York, NY .

. . USA").  The Defendant's reply and oral arguments do not dispute these redemption transaction

records.

The Plaintiffs have shown that the Defendant was able to use a foreign-based or a U.S.-

based correspondent bank account for its redemption requests and, through its alleged agent, chose

the latter.  *See* Margolin Decl. Exs. 78, 80, 82, 84, 86, ECF No. 1157 (Redemption Records); *see

also* Joyce Decl. at 6–9, ECF No. 1158.; *id.* at 11 ("[Subscription agreements for Fairfield Sentry]

do not contain any requirement that the subscriber utilize a U.S. account to send subscription

payments or receive redemption payments."); *id.* ("Neither the fact that Fairfield Sentry was a

U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers

to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made

redemption payments from its own U.S. account would have prevented a subscriber from making

subscription payments from and directing redemption payments to a U.S. dollar account located

outside the U.S."); *id.* at 12 ("The U.S. dollar was in wide circulation outside the U.S. during the

Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

This was no passive endeavor; the Plaintiffs allege that, following CSAG's instructions, "[t]he Citco Subscriber *frequently* used U.S. correspondent accounts in transacting with Sentry." Opp'n at 30, ECF No. 1156 (emphasis in original). Defendant did so repeatedly, authorizing its agent to use U.S.-based accounts for eighteen subscription and redemption payments, eventually redeeming over $3.48 million. *Id.* at 3, 30–31. Defendant, through its purported agent, selected and used a correspondent account at HSBC Bank USA in New York to receive nine redemption payments from Sentry. *Id.*; Margolin Decl. Exs. 78, 80, 82, 84, 86 (Redemption Records). CSAG accomplished the conduct at the heart of the Liquidators' claims through its use of U.S.-based accounts. The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations supports a finding of sufficient minimum contacts. *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013).

CSAG further argues that any use of correspondent accounts that may have occurred was incidental and insufficiently related to the harm for which the plaintiffs seek redress. Reply at 9, ECF No. 1283. The Second Circuit has determined that allegations of a "foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci*, 732 F.3d at 168 (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (2012)); *see also Spetner v. Palestine Investment Bank*, 70 F.4th at 632, 640

(2d Cir. 2023) ("[A] defendant foreign bank's 'repeated use of a correspondent account in New York on behalf of a client . . . can constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum."). [15]  A course of dealing can be established through as little as "14 currency exchange transactions between" two foreign entities made to a New York bank. *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 325 (2016).

The Liquidators' allegations and evidence show the Defendant's use of U.S.-based accounts for up to eighteen subscription and redemption payments over a seven-year period. *See* Opp'n at 31, ECF No. 1156; *see also* Margolin Decl. Exs. 78, 80, 82, 84, 86 (Redemption Records). The subscription and redemption forms show that Defendant's purported agent, the Citco Subscriber, designated the U.S.-based correspondent bank, to which Sentry accordingly sent the relevant payments.  The repeated use of New York-based correspondent accounts, while foreign options existed, demonstrates Defendant's purposeful availment of the banking system of the United States.

CSAG argues in passing that the Liquidators cannot plead allegation of repeated "recurring" usage because the Court had previously held that "each transaction involving Redemption Payments is a separate claim." Mem. L. at 11, ECF No. 830.  Specifically, CSAG relies on *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167 (Bankr. S.D.N.Y. 2018) to argue that the Plaintiffs must independently establish the Court's exercise of jurisdiction over each of the redemption payments. Mem. L. at 11; 594 B.R. at 190 ("Each transfer is a separate claim, . . . and the Trustee must establish the court's jurisdiction with respect to each claim asserted.").  Here, the Defendant's implicit argument is that, since the pertinent issue concerns a single use with

---

[15]    Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an agent."  70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

respect to any given claim, the Plaintiffs would not be able to show repeated use of an account for any individual transfer.

However, it is not the quantity of transactions, standing by itself, that the Court considers in the jurisdictional analysis. The Second Circuit explained in *Licci*, 732 F.3d 161, that "both the frequency and deliberate nature" of a defendant's use of correspondent accounts determines whether the conduct shows purposeful availment. *Licci*, 732 F.3d at 168; *id.* at 171 ( "[Defendant] deliberately chose to process the many . . . wire transfers through AmEx in New York . . . . *Moreover*, [defendant]'s use of a correspondent account in New York to accomplish its dollar-denominated wire transfers was recurring.") (emphasis added). The number of repeated uses of a U.S. account is relevant to the jurisdictional analysis either to show the deliberate nature of that use or in conjunction with the deliberate nature of that use. *See id.* This Court has already stated that a single deliberate selection and use of a U.S.-based account can sufficiently demonstrate a defendant's purposeful availment of the banking system of New York and the United States. *See Fairfield Sentry Ltd. v. BNP Paribas Sec. Servs. (In re Fairfield Sentry Ltd.)*, Adv. Pro. No. 10-03627 (JPM), 2024 WL 3024512, at *10 (Bankr. S.D.N.Y. June 14, 2024).

Further, the Second Circuit has stated that a court may consider contacts that "may not have directly given rise to the plaintiff's cause of action, [but] certainly 'relate to' it. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 (1985)). The repeated uses of a U.S.-based correspondent account by the Defendant may underlie separate claims; the uses also relate to each other.

The Liquidators have provided support for the allegation that Defendant, through its agent, chose to use a U.S. correspondent account to receive a payment from Sentry. Opp'n at 10–13,

ECF No. 1156; Margolin Decl. Ex. 78, 80, 82, 84, 86, ECF No. 1157 (Redemption Records); *see also* Joyce Decl. 8–9 (demonstrating the availability of foreign banks during the relevant period). The redemption forms show that Defendant's agent designated the U.S.-based correspondent bank, to which Sentry accordingly sent the relevant payment. CSAG is alleged to have received over $3.66 million through these transactions, demonstrating its purposeful availment of the banking system of New York and the United States. Defendant, through its agent, chose to use New York-based accounts while foreign options existed.

### 4. **Defendant's Business Contacts with the Forum**

The Liquidators assert that CSAG "intentionally invested in BLMIS feeder funds Sentry and Sigma knowing that the [Fairfield] Funds were designed to subsequently invest that money in New York-based BLMIS. CSAG is subject to this Court's jurisdiction with respect to its Sentry and Sigma redemptions [and subscriptions] as a result of that conduct." Opp'n at 20, ECF No. 1156. Defendant describes the allegations that the Citco Subscriber made subscription payments on behalf of beneficial shareholders such as CSAG while knowing that those payments would be invested in BLMIS in New York as the unilateral activity of a third-party, which Defendant argues is not appropriate to consider under *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984). *See* Mem. L. at 16, ECF No. 830.

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros*, 466 U.S. at 418. The Supreme Court found that "one trip" to the forum "for the purpose of negotiating the transportation-services contract . . . cannot be described or regarded as

a contact of a 'continuous and systematic' nature . . . ." *Id.* at 416.  The Liquidators, however, have described more substantial contacts here.

First, the Liquidators point to the Sentry subscription agreements — which incorporated the Sentry offering materials prepared by FGG, prior to and during the period when CSAG subscribed to Sentry — that CSAG executed.  Opp'n at 6–7, ECF No. 1156 ("[CSAG] has received and read a copy of [Sentry's Private Placement Memorandum]. [CSAG] acknowledges that in making a decision to subscribe for [Sentry's shares], [CSAG] has relied solely upon the Fund Documents and independent investigations made by [CSAG].") (quoting Margolin Decl. Ex. 1, ¶¶ 1, 7).  The January 1997 memorandum describes Sentry's dependence upon BLMIS in a subsection under the title of "RISK FACTORS."  Margolin Decl. Ex. 60 at 18, ECF No. 1157 ("The services of Messrs. Kolber, Berman, Tucker and Noel and Bernard L. Madoff Investment Securities are essential to the continued operations of [Fairfield Greenwich Limited]. If any of their services were no longer available, their absence would have an adverse impact upon an investment in [Sentry]. [Fairfield Greenwich Limited] has delegated all investment management duties to [BLMIS].").  This memorandum also describes the business objective of the company "seek[ing] to achieve capital appreciation of its assets by allocating its assets to an account at [BLMIS], a registered broker-dealer in New York, which employs an options trading strategy described as 'split strike conversion'."  *Id.* Ex. 60 at 4; *see also id.* Ex. 45 at -805.  The July 2003 memorandum made clear that BLMIS had "approximately 95% of [Sentry]'s assets under custody."  *Id.* Ex. 46 at -932.[16] That memorandum also explained that investing in Sentry would require a wire transfer of funds

---

[16]    Many of CSAG's investments in Sentry predate its receipt of the January 2003 private placement memorandum. *See* Margolin Decl. Ex. 6–13 (September through November 2002 subscription and transfer records). Specific information contained only in this 2003 memorandum thus might apply only to subscriptions that were made after Defendant received it.  However, any specific information that was initially gained by CSAG in 2003 may relate to its knowledge at the time it received payments for redeeming shares on investments made prior to 2003.

to Sentry's account at HSBC Bank USA in New York.  *Id.* Ex. 46 at -930.  These documents show that Defendant was aware at the time that its investments in the Funds were effectively investments in BLMIS in New York.  CSAG, through its agent, executed subscriptions into Sentry with this knowledge.  *See id.* Ex. 4, 5, 14–30 (April 2004 through June 2008 Sentry Subscription Agreements and Transfer Materials).

CSAG argues that the Plaintiffs "improperly read the subscription agreements [] as imposing a New York forum selection clause…"  As a result, the Plaintiffs "are now grasping to justify maintaining [the] litigations against CSAG [] in New York, *a forum with no connection to the redemption transactions at issue*."  Mem. L. at 4–5, ECF No. 830. (emphasis added).  The Defendant cites the Court's August 2018 *Fairfield I* opinion, where it held that it lacks personal jurisdiction over certain defendants due to subscription agreements that provided for consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the Fund." *Fairfield I*, 2018 WL 3756343, at *11.  However, the Liquidators here rely on the subscription agreements and private placement memoranda not to show consent, but to show that when Defendant invested in Sentry it did so knowing that it would avail itself of the benefits and protections of New York.  Opp'n at 20–26, ECF No. 1156.  The Court's holding in *Fairfield I* that the subscription agreement forum selection clause is itself an insufficient basis for exercising personal jurisdiction does not invalidate the import of those clauses for assessing purposeful availment.  The subscription agreements signed by CSAG support the Plaintiffs' showing of contacts with the forum. [17]  *See* Margolin Decl. Exs. 1–2, 4–5, 14–28 ECF No. 1157.

---

[17]     The two long form subscription agreements produced by CSAG in discovery were signed by "CREDIT SUISSE" and included CSAG's registered address in the signature block, while the shares were registered in CSLN's name.  *See* Margolin Decl. Ex. 1 at -761, -763; *id.* Ex. 2 at -788, -790.  Seventeen short form subscription agreements from between February 2004 and June 2008 identified Citco Global Custody as the subscriber and the entity in whose name the shares were to be registered.  *See, e.g., id.* Ex. 4  at -785, Ex. 5 at -010, Ex. 14 at -799.

The Plaintiffs supplies further evidence to support the allegations of contacts. Exhibits show CSAG "conducted an extensive investigation into the Funds and BLMIS to evaluate their prospects as potential investment targets." Opp'n at 8; Margolin Decl. Ex. 33 (March 2005 emails from numerous FGG employees to an employee of CSAG scheduling an appointment to discuss FGG's "risk management of fund [and] transparency…"); *id.* Ex. 34 (March 2007 email from a CSAG employee to two FGG employees expressing an interest to set up an additional meeting involving CSAG's "structuring & financial arm…"); *id.* Ex 35 (August 2005 email from a CSAG employee requesting answers to diligence questions related to investments in Sentry); *id.* Exs. 36, 37 at -181 (March 2008 email from FGG to CSAG attaching a Confidentiality Agreement stating that CSAG "will receive certain confidential information including certain risk and exposure reports and other information concerning the portfolio holdings of the Funds").

CSAG also argues that "[n]one of the cited communications with FGG personnel, even those discussing in-person hearings, make any reference to meetings in the United States." Reply at 6. However, the Plaintiffs' evidence shows that the relevant emails to CSAG include ones from FGG employees with addresses bearing the country code designations for the United Kingdom (Margolin Decl. Exs. 33, 34) and United States (*Id.* Ex. 34–36) (emails to and from individual with "fggus.com" address). CSAG does not dispute its email contacts with U.S.-based FGG employees. Since the Court must "resolve all doubts, including factual disputes, in the plaintiff's favor" at this stage, it finds CSAG's mere assertion here insufficient to overcome the Plaintiff's evidence. *Averbach v. Cairo Amman Bank*, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (citing *Ball*, 902 F.2d at 197).

The evidence provided by the Plaintiffs of the Defendant's subscriptions and investments in and redemptions from Sentry demonstrates more than mere purchases or a one-time visit to the

forum.  The Liquidators have demonstrated facts supporting continuous and systemic contacts with the forum.

**5.    Whether the Defendant's Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction**

The Court will address CSAG's remaining argument that the alleged contacts are not jurisdictionally relevant under Supreme Court precedent.  Mem. L. at 16–18, ECF No. 830; Reply at 7–12, ECF No. 1283.  Specifically, the Defendant argues that CSAG's "knowledge that the Funds would invest some of their own money with BLMIS in New York" is "insufficient as a matter of law to support jurisdiction" under *Walden v. Fiore*, 571 U.S. 277 (2014).  Mem. L. at 17–18.

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada."  *Walden*, 571 U.S. at 289.  The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis."  *Id.*  As the Supreme Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's conduct . . . must form the necessary connection with the forum State."  *Id.* at 285.  Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties."  *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investments into BLMIS in New York and selection and use of U.S.-based correspondent accounts, as described above, demonstrate that CSAG and its agent took affirmative actions on its own apart from the conduct of the Plaintiffs.  *See* Opp'n at 16–20, 30–31, ECF No. 1156.  The Liquidators have shown that the Defendant knew and intended that, by investing in the Funds, Defendant's money would enter

into U.S.-based BLMIS.  *Id.*; *see also* Margolin Decl. Ex. 46 (July 2003 Sentry private placement memorandum).  This certainty can be found in the Fairfield Funds' contractual obligation to invest at least 95% of the money they received in U.S.-based BLMIS.  *See id.* at 26; *see also id.* Ex. 40 at -833("The Investment Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value, measured at the time of investment) to alternative investment opportunities other than its 'split strike conversion' investments . . . ."); *see also id.* Ex. 46 at -932 ("Currently BLM has approximately 95% of the Fund's assets under custody.").  Defendant benefited from the materials that it received from FGG which confirmed the investments would be made with BLMIS in New York.  *See id.*

The Court thus finds that Defendant's selection and use of U.S. correspondent accounts through its agent, and due diligence concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong.  The contacts are not random, isolated, or fortuitous.  The contacts demonstrate CSAG's purposeful activities aimed at New York in order to effectuate transfers from Sentry.  The Plaintiffs have thus provided allegations that sufficiently support a prima facie showing of jurisdiction over the Defendant.

**C.  Whether the Claim Arises Out of or Relates to the Defendant's Forum Conduct**

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original).  "[P]roof that the plaintiff's claim came about because of the defendant's in-state conduct" is not required.  *Id.* at 1026.  Instead, a court need only find "an affiliation between the forum and the underlying controversy."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. at 190 ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the claims are "wholly unrelated to the Funds' investments in, or redemptions from BLMIS."  Mem. L. at 12, ECF No. 830.  However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated.  Am. Compl. ¶¶ 173–74, 206–09, ECF No. 679.  The issue of knowledge of the inflated NAV is inextricably tied to the Defendant's investments with New York-based BLMIS.  The allegations are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds.  *Id.* ¶¶ 173–74.  The Defendant's contacts with the United States, in investing in and in communications with the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum.  *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

### D. **Whether Assertion of Personal Jurisdiction is Reasonable**

If a defendant has sufficient minimum contacts, the Court must then ask "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice' — that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Where a plaintiff "makes the threshold showing of the minimum contacts required for [exercising personal jurisdiction], a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3 (quoting *Bank Brussels Lambert*, 305 F.3d at 129). Factors the Court will consider include the burden on the defendant, the interests of the forum in adjudicating the case, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies. 305 F.3d at 129.

The Defendant argues that "the United States' interest in adjudicating this dispute is minimal at best [as] the dispute is between foreign parties under foreign law under a foreign contract for the return of cash sent between two foreign countries in a purely foreign transaction." Mem. L. at 20, ECF No. 830 (citing *In re Fairfield Sentry Ltd.*, 458 B.R. 665, 682 (S.D.N.Y. 2011) (Preska, C.J.)). CSAG further argues that litigating in this Court would "impose substantial burden" on the Defendant, because of its status as a Swiss financial institution, "discovery of documents about these redemption payments in the United States would potentially expose CSAG to civil and criminal liability under Swiss law. *Id.* at 21. Defendant also argues that the Liquidators

have not "demonstrated that it is more reasonable for them to litigate their claim" in this Court, especially when BVI courts and Swiss courts may be the more appropriate forums to pursue these claims. *See id.*

The Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced. In that case, the District Court determined whether the proceeding was core or non-core; it did not determine whether adjudication or jurisdiction in the United States was reasonable. *See id.* at 675. The Defendant argues it is burdened by the potential exposure to civil and criminal liability. Mem. L. at 21. In support of this argument, the Defendant cites to a ruling in which the Court granted in part and denied in part a motion seeking relief as to the order staying the action and seeking expedited initial disclosures on beneficial holders. *Id.*; *see* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799 (the "July 2012 Bench Ruling"). This Court based that ruling on a comity analysis in light of the then-uncertain "offshore underpinnings for this litigation in its entirety." July 2012 Bench Ruling at 2. The Court stated in that ruling that it was "hard-pressed to find any compelling United States' interest in mandating discovery here *at this juncture* of the pending litigation." July 2021 Bench Ruling at 2–3 (emphasis added).

The Defendant has not shown that the interests at stake in that proceeding over ten years ago, are the same as those at stake now. While the defendants in the July 2012 Bench Ruling were able to identify specific laws in foreign countries that would have been broken by complying with the Court's prior order, CSAG only describes a potential exposure to liability here. *See* Mem. L. at 21. This Court lifted the stay and required the Defendant to proceed to discovery in 2021. Order Lifting Stay, ECF No. 675; Scheduling Order, ECF No. 714. The July 2012 Bench Ruling shows that this Court can alleviate specific burdens identified by a defendant, but the mere potential for exposure to unspecified liability is not a burden that renders exercise of jurisdiction unreasonable.

Defendant has also alleged that other forums may be able to hear the claims. What it has not done is demonstrate how this forum would fail to provide effective relief. *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3. Defendant does not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction. *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023). The Defendant has not established that the Court's exercise of personal jurisdiction over it would be unreasonable. The Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with "traditional notions of fair play and substantial justice . . . ." *See Int'l Shoe*, 326 U.S. at 316, 66 S. Ct. 154.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the Amended Complaint. The Liquidators shall submit a proposed order consistent with the findings in this decision in accordance with Local Bankruptcy Rule 9074-1.

**IT IS SO ORDERED.**

Dated: November 13, 2024
      New York, New York

                                    /S/ John P. Mastando III
                                    THE HONORABLE JOHN P. MASTANDO III
                                    UNITED STATES BANKRUPTCY JUDGE