**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

*FOR PUBLICATION*

| | |
|---|---|
| In re: | Chapter 15 |
| Fairfield Sentry Limited, et al. | Case No. 10-13164 (JPM) |
| | (Jointly Administered) |
| Debtors in Foreign Proceedings. | |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 10-03636 (JPM) |
| ABN AMRO SCHWEIZ AG a/k/a AMRO (SWITZERLAND) AG, et al., | |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO DISMISS**</u>

*APPEARANCES:*

**SULLIVAN & CROMWELL LLP**
*Attorneys for Defendant, Bank J. Safra Sarasin AG, f/k/a Bank Sarasin & Cie*
125 Broad Street
New York, NY 10004
By:     Andrew J. Finn
        Mark Makar
        Jeffrey T. Scott

**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs, Joint Liquidators*
Seven Times Square
New York, NY 10036
By:     Jeffrey L. Jonas
        David J. Molton
        Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is the motion of the Defendant, Bank J. Safra Sarasin AG, f/k/a Bank Sarasin & Cie ("BJSS" or "Defendant"), to dismiss the Fifth Amended Complaint (the "Amended Complaint" or "Am. Compl.") for lack of personal jurisdiction.  Mot. to Dismiss (the "Motion"), ECF[1] No. 831.  The parties did not request oral argument on the Motion, and instead indicated that they were resting on the papers.  *See Letter re: Status of Remaining Oral Arguments,* Ex. A, ECF No. 1323.  For the reasons set forth herein, the Court DENIES the Defendant's Motion to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court previously concluded that it has subject matter jurisdiction over this and related actions.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*"); *see also* Stip. Order, ECF No. 577.  Personal jurisdiction is contested by the Defendant and will be discussed below.

## III.    BACKGROUND

This adversary proceeding was filed on September 21, 2010.  *See* ECF No. 1; *see also Amended Complaint Against All Defendants* (the "Complaint" or "Compl."), ECF No. 8.  Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry"),

---

[1]        Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03636-jpm unless otherwise noted.

Fairfield Sigma Limited (In Liquidation) ("Sigma"), and Fairfield Lambda Limited (In Liquidation) ("Lambda" and, together with Sentry and Sigma, the "Fairfield Funds" or the "Funds") filed the Amended Complaint on August 12, 2021. *See* Am. Compl., ECF No. 679. Via the Amended Complaint, the Liquidators seek the imposition of a constructive trust and recovery of over $1.7 billion in redemption payments made by Sentry, Sigma, and Lambda to various entities known as the Citco Subscribers. *Id.* ¶¶ 1–2, 205–06; *id.* Exs. A–C.[2] Of that amount, Defendant allegedly received over $4.6 million[3] through redemption payments from its investment in Sentry and Sigma. *Memorandum of Law in Opposition to Bank J. Safra Sarasin AG's Motion to Dismiss the Fifth Amended Complaint* (the "Opposition" or "Opp'n") at 1, ECF No. 1105; *see also Declaration of Lena Konanova in Support of the Liquidators' Opposition* ("Konanova Decl.") Exs. 22–27, ECF No. 1106 (Redemption Records).

### A. THE BLMIS PONZI SCHEME

This adversary proceeding arises out of the decades-long effort to recover assets of the Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[4] *See* Am. Compl. ¶ 1, ECF No. 679. The Citco Subscribers allegedly invested, either for their own account or for the

---

[2]    At the time of the filing of the Amended Complaint, the Plaintiffs made no specific allegations as to the exact amounts received by any of the beneficial shareholders. With respect to BJSS, the Amended Complaint states in relevant part that "[b]ased on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Bank Sarasin & Cie." Am. Compl. ¶ 46. The Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers. *Id.* ¶¶ 34–112. This opinion concerns only those payments that the Plaintiffs allege were paid to BJSS.

[3]    Of that total U.S. Dollar amount, the Plaintiffs allege that BJSS "received approximately $3,654,602.87 from Sentry and approximately €730,157.56 from Sigma through the redemption payments at issue. [T]he Liquidators have applied the exchange rate as of the date of each redemption payment out of Sigma and calculated the dollar value of the Sigma redemptions to be approximately $1,028,984.78. This number may vary if the Court ultimately determines that a different exchange rate applies." Opp'n at 1 n.2, ECF No. 1105.

[4]    The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff. Details of that scheme have been recounted by many courts. *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

account of others, into several funds — including Sentry, Sigma, and Lambda — that channeled investments into BLMIS.  *Id.* ¶¶ 2, 5, 15.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 133–34; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund— what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and then invests the money.").  Fairfield Sigma and Lambda, in contrast, were indirect feeder funds, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currencies.  *See* Am. Compl. ¶¶ 133–34.  BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme.  *Id.* ¶¶ 5–7, 13. Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart.  *Id.* ¶¶ 7–8, 12–14, 134.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV").  *Id.* ¶ 7.  The Citco Subscribers and the beneficial shareholders were allegedly such investors.  *Id.*  To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry."  *Id.* ¶ 136.  In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred.  *Id.* ¶ 137.  The money sent to BLMIS by the Fairfield Funds for the purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses."  *Id.*  The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares.  *Id.*

¶ 139.  The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments.  *Id.*

BJSS is a "corporate entity organized under the laws of Switzerland" with a registered address in Basel, Switzerland.  *Id.* ¶ 46.  BJSS allegedly invested into and redeemed shares of Sentry and Sigma through "several companies within the Citco corporate family."  Opp'n at 5–6, ECF No. 1105.  Investments into the Funds were registered in the name of Citco Fund Services (Europe) B.V., and Citco Global Custody N.V (together, "Citco Global Custody").  *Id.*  Citco Bank Nederland N.V. Dublin ("Citco Bank") allegedly carried out subscriptions and redemptions on behalf of BJSS and other investors.  *Id.*  Citco Bank and Citco Global Custody (collectively, the "Citco Subscriber")[5] served as the subscriber of record for BJSS's shares of the Fairfield Funds.  *See id.* at 5–6.  The Citco Subscriber was organized under the laws of either Curaçao or the Netherlands.  *See Memorandum of Law in Support of Motion to Dismiss for Lack of Personal Jurisdiction* (the "Memorandum of Law" or "Mem. L.") at 5 n.5, ECF No. 834.

BJSS invested in two Fairfield feeder funds – Sentry and Sigma – in 2007 via the Citco Subscriber, which is alleged to have facilitated investments in the Fairfield Funds for numerous shareholders in this proceeding.  Opp'n at 5-6.  In connection with such investments, BJSS opened an account at Citco Bank.  *Id.* at 9.  Further, BJSS also appointed Citco Bank to provide "'brokerage services and appointed Citco Global Custody to provide 'custody services.'"  *Id.*; *see* Konanova Decl. Ex. 16 at 2, ECF No. 1106 ("The brokerage and custody agreement Sarasin

---

[5]       The Court will refer to the "Citco Subscriber" in this opinion as it is defined by the Plaintiffs in their opposition memorandum.  *See* Opp'n at 5, ECF No. 1105.  The Amended Complaint refers to the "Citco Subscribers," a term that is defined to include both Citco Bank and Citco Global Custody, as relevant to this motion, and other Citco banking and custody entities.  *See* Am. Compl. ¶ 8, ECF No. 679 (defining the Citco Subscribers to include Citco Global Custody NV, Citco Global Custody (NA) NV, Citco Fund Services (BVI), Citco Fund Services (Europe) BV, Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch (a wholly owned subsidiary of Citco Bank Nederland N.V.), the Citco Banking Corporation N.V.).

entered with Citco Bank Nederland N.V. and Citco Global Custody N.V. (BSC-00001076) allowed Citco to engage in transactions with respect to [] subscriptions in the Funds.").[6]  These services included, among others, the "register[ing] [of] the Securities, other than physically held bearer shares, in the name of the Custodian or sub-custodian and [the] [] keep[ing] [of] the Securities in the custody of the Custodian. . . [and depositing] in the Account all monies received from or for the account of the Customer[.]".  Konanova Decl. Ex. 14 at -1079.  The B&C Agreement further empowered and obligated the Citco Subscriber, "when instructed to do so by [BJSS] . . . to make settlement of transactions undertaken by or for [BJSS]" and to "deliver[] or receiv[e] the Securities or other assets of [BJSS] and mak[e] or receiv[e] payments for the account of [BJSS]."  *Id.*  BJSS allegedly retained the Citco Subscriber as its agent by January 2000 when BJSS and the Citco Subscriber entered into this B&C Agreement.  *See* Opp'n at 9.[7]

From June 2007 through July 2008, BJSS allegedly subscribed through the Citco Subscriber for 1,621.8005 shares of Sentry and 1,953.2973 shares of Sigma.  *See* Opp'n at 3.  BJSS, through the Citco Subscriber, redeemed a total of $4,683,587.65 through 14 redemptions from Sentry and 3 redemptions from Sigma from August 2007 through November 2008.  *See* Opp'n at 13; *see also* Konanova Decl. Exs. 2, 26 (Sentry & Sigma Redemption Records).  In addition to these redemption payments, BJSS allegedly received fees from the clients on whose behalf it

---

[6]    Neither BJSS nor the Citco Subscriber has produced a copy of the brokerage and custody agreement. However, the Defendant produced to the Liquidators a Custodian Agreement between BJSS and the Citco Subscriber, dated June 26, 1998. (the "Custodian Agreement").  *See* Konanova Decl. Ex. 14, ECF No. 1106.  Similar to a brokerage and custody agreement, this Custodian Agreement sets forth certain duties of the custodian (the Citco parties) and the customer (BJSS) in connection with executing certain investment transactions.  *See id.* Ex. 14 at -078, -080. Accordingly, for the purpose of this Motion, the Liquidators refer to the Custodian Agreement and the First Amendment to the Brokerage & Custody Agreement (*id.* Ex. 15, together with the Custodian Agreement, the "B&C Agreement" ) as parts of the operative B&C Agreement.

[7]    The First Amendment to the Brokerage & Custody Agreement (Konanova Decl. Ex. 15, ECF No. 1106) references a brokerage & custody agreement between BJSS and the Citco Subscriber, dated January 12, 2000.  *See* Opp'n at 9 n.10, ECF No. 1105.

invested.  *See* Opp'n at 13–14; *see also* Konanova Decl. Ex.  27 at -112 (A copy account balance statement showing BJSS crediting a customer account a "commission" fee for a $25,175 Sentry redemption).  At the directions and instructions of the Citco Subscriber, as the alleged agent of BJSS , "some . . . of the Redemption Payments were received at . . . designated United States-based bank accounts."  Am. Compl. ¶ 141.

Bernard Madoff was arrested for alleged violations of federal securities laws on December 11, 2008.  Am. Compl. ¶ 193.  The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme.  *Id*.  On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities.  *Id.* ¶ 194.  In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations.  *Id.* ¶¶ 195–96.  Madoff was sentenced to 150 years in federal prison and died in April 2021.  *Id.* ¶ 197.

The Amended Complaint alleges that the Citco Subscribers, including the purported agents of BJSS, "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made.  *Id.* ¶ 209.  The Amended Complaint further asserts that, while receiving redemption payments, the Citco Subscribers "uncovered multiple additional indicia that Madoff was engaged in some form of fraud" but "turned a blind eye, [and] accept[ed] millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the law of the British Virgin Islands . . . ."  *Id.* ¶¶ 8, 209.  These indicia included verification that there was no "independent confirmation that BLMIS-held assets even existed," Madoff's failure to segregate duties, and BLMIS's "employing an implausibly small auditing firm" rather than a reliable auditor.  *Id.* ¶¶ 9, 209.  In the face of red flags such as these, the Citco Subscribers and other Citco entities purportedly "quietly reduced

[their] own exposure to BLMIS through the Funds, and significantly increasing its Custodian fees

to offset the risk." *Id.* ¶ 209.

## B.  THE PRIOR LITIGATION AND PROCEDURAL HISTORY

The Fairfield Funds were put into liquidation in the BVI in 2009.  Am. Compl. ¶¶ 26–29,

ECF No. 679.  The BVI court issued orders appointing the foreign representatives, Kenneth Krys

and Greig Mitchell, as liquidators of the Fairfield Funds.  *Id.* ¶ 29.  Pursuant to the appointment

order of the BVI court,[8] the "Foreign Representatives are responsible for all aspects of the Funds'

business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 203.

The Liquidators commenced actions in the BVI against a number of investors who had redeemed

shares of the Fairfield Funds before the collapse of the scheme.  Mem. L. at 4, ECF No. 827;

*Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also*

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284

(Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the

Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings.  Am.

Compl. ¶ 30.  This Court granted that recognition on July 22, 2010.  *Id.*  All cases filed by the

Plaintiffs were administratively consolidated before this Court in November 2010.  *See*

Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

The Plaintiffs asserted multiple causes of action in those consolidated adversary

proceedings including, *inter alia*, mistaken payment and constructive trust.[9]  Compl. ¶¶ 63–86,

---

[8]      The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See* Am. Compl. at 1.

[9]      Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the implied covenant of good faith and fair dealing. *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at 463, (S.D.N.Y. 2022).

ECF No. 8; *see also* 630 F. Supp. 3d at 479.   In October 2011, this Court stayed the U.S. proceedings pending resolution of the BVI proceedings.   *See* Am. Order Staying Redeemer Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *Fairfield I*, 2018 WL 3756343, at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for restitution based on mistaken payment. *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014] UKPC 9 ("*Migani* ").[10]  The Privy Council held that the Plaintiffs' claims for restitution in the BVI to recover redemption payments arising out of transactions governed by the Funds' Articles of Association are governed by BVI law.  *Id.* ¶ 17.   The Plaintiffs' claims to recover redemption payments thus depended on whether Sentry was bound to make those payments under the "true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption."  *Id.* ¶ 19.   The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption.  *Id.* ¶ 21.   The redemption payments made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken.  *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates.  *See Fairfield I*, 2018 WL 3756343, at *5–6.  Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV

---

[10]     *Migani* is available at https://jcpc.uk/uploads/jcpc_2012_0061_judgment_416722c30e.pdf and, without numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd.* (*In Liquidation*) *v. Migani*, 2014 WL 1219748.

was inflated at the time. *See id.* at *6. The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith. *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295. Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called "Knowledge Defendants" to proceed:

> The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust.

*Id.* at 301. In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022). The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. Mot. to Amend, ECF No. 618; Mot. to Amend, Adv. Pro. No. 10-03496, ECF No. 3737. On August 5, 2021, this Court granted the motion to amend the complaint and lifted the stay of the redeemer actions. *See* Order Granting Mot. to Amend, ECF No. 676; *see also* Order Lifting Stay of Redeemer Actions, ECF No. 675.

## C.  **THE PENDING MOTION**

The Amended Complaint seeks the imposition of a constructive trust on the redemption payments received from the Fairfield Funds.  *See* Am. Compl. ¶ 205, ECF No. 679.  The Amended Complaint alleges that Defendant's purported agent, the Citco Subscriber, had knowledge of the fraud at BLMIS and therefore knowledge that the NAV was inflated.  *Id.* ¶ 209.  "By reason of their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been unjustly enriched to the detriment of the [Fairfield] Funds and other shareholders and creditors of the Funds."[11] *Id.* ¶ 213.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact."  *Id.* ¶ 206 (citing *Fairfield II*, 596 B.R. at 293).  As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, "the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and third, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty."

*Fairfield IV*, 2021 WL 771677, at *3 (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the defendants, including BJSS as a beneficial shareholder of certain accounts, purposefully availed themselves of the laws of the United States and the State of New York by "investing money with the Funds, and knowing and intending that

---

[11]    As stated *supra*, footnote 3, the Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers.  *Id.* ¶¶ 34–112.

the Funds would invest substantially all of that money in New York-based BLMIS." Am. Compl. ¶ 20, ECF No. 679.

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022. *See* Scheduling Order, ECF No. 714; Second Am. Scheduling Order, ECF No. 997. Merits document and expert discovery is ongoing in this case. *See* Fourteenth Am. Scheduling Order, ECF No. 1321; *see also* Fifteenth Am. Scheduling Order, ECF No. 1336.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 12–13 ECF No. 834.

The Liquidators filed an opposition to the Motion and submitted the declarations of Lena Konanova and Sara Joyce in support of their opposition. *See* Opp'n, ECF No. 1105; Konanova Decl., ECF No. 1106; Declaration of Sara Joyce ("Joyce Decl."), ECF No. 1107.[12] The Liquidators argue that exercising jurisdiction over Defendant would be reasonable and that Defendant's contacts with the United States, through its own actions and those of its purported agent, in knowingly and intentionally investing in Sentry, using U.S. correspondent accounts to invest in and receive payments from Sentry, and conducting other business activities support personal jurisdiction. Opp'n at 1–4. Defendant filed a reply memorandum on August 24, 2023. *Reply Memorandum of Law in Further Support of Motion to Dismiss the Fifth Amended Complaint* (the "Reply"), ECF No. 1221. In considering the Defendant's Motions, the Court has reviewed the above filings, all other relevant submissions, and the record as a whole.

---

[12]    Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal. For the analysis in this opinion, the Court will refrain from referring to any bank account numbers or names of individual employees, named only in sealed documents, in full.

## IV.    DISCUSSION

### A.  THE LAW OF PERSONAL JURISDICTION

In order to subject a defendant to personal jurisdiction in the United States, due process requires that the defendant have sufficient minimum contacts with the forum in which the defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In adversary proceedings, courts must determine whether the defendant has minimum contacts with the United States, rather than with the forum state." *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)). "When jurisdiction is satisfied through Bankruptcy Rule 7004,[13] a bankruptcy court need not address its state's long-arm statute." *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp.* (*In re Celotex Corp.*), 124 F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted). There are three conditions necessary for the Court to exercise specific jurisdiction[14] over the non-resident defendant:

---

[13]     "The summons and complaint and all other process except a subpoena may be served anywhere in the United States." Fed. R. Bankr. P. 7004(d).  A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States." Fed. R. Bankr. P. 7004(f).

[14]     Courts recognize "two types of personal jurisdiction: general and specific jurisdiction.  A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)).  The Plaintiffs do not

First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State.  Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct.  Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2), the Plaintiffs "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)).  A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation."  *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Following discovery, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."  *Ball*, 902 F.2d at 197.  "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction.'"  *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85).  "Now that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy."

---

allege that the Court has general jurisdiction over Defendant. *See* Reply at 4, ECF No. 1221 (arguing that the Plaintiffs fail to "establish[] [BJSS's] sufficient minimum contacts for specific personal jurisdiction."); Opp'n at 2–3 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

*Averbach* , 2023 WL 5016884, at *6 (citing 722 F.3d at 85).  "Plaintiffs need only show that their prima facie showing of jurisdiction is factually supported."  *Id.* at *6.  When considering a motion to dismiss before or after jurisdictional discovery has taken place, "the court must 'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual disputes, in the plaintiff's favor."  *Id.* at *4 (quoting *Ball*, 902 F.2d at 197).

## B. <u>ANALYSIS OF PURPOSEFUL AVAILMENT</u>

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci IV*")).  For specific personal jurisdiction, "'[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the forum.'"  *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)).  "Although a defendant's contacts with the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'"  *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*, 571 U.S. at 134) (alteration in original).  "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction."  *Id.*

BJSS asserts that the Liquidators "affirmatively argued to the District Court that all Redemption Payments to Citco Brokerage Customers (including BJSS) occurred outside the United States . . . ."  Mem. L. at 12, ECF No. 834.  Plaintiffs argued before the District Court that

"every relevant component of the [redemption] transactions at issue here occurred **outside the territorial jurisdiction of the United States**." *Id.* at 2 (emphasis in original); *see also Plaintiffs-Appellants' Opening Brief for Second-Round Appeal* at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief"). The Plaintiffs' Opening Brief concerned the extraterritorial application of the § 546(e)[15] safe harbor. *See* Opening Brief at 24 (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States.").

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co.* (*In re Ampal-Am. Israel Corp.*), 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant

---

[15] Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ." 11 U.S.C. § 546(e). "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer." *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test." *Licci IV*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

The Plaintiffs allege that Citco acted as an agent of the Defendant with respect to its investments with the Fairfield Funds. *See* Opp'n at 2, ECF No. 1105. Many of the jurisdictional contacts that the Plaintiffs refer to rely on this agency relationship. *Id.* at 2—3. The Defendant argues that the Plaintiffs' attempt to deem the Citco Subscribers as BJSS's agent "ignore[s] the law of the case and the actual contacts that arose from BJSS's limited Custody Agreement with the Citco Subscribers." Reply at 11, ECF No. 1221. The Court has already found that "the Funds were customers of Citco Bank who acted as their agents in connection with the securities contracts pursuant to which the redemption payments were made ...." *Fairfield III*, 2020 WL 7345988, at *7. BJSS contends that the "evidence shows that BJSS's relationship with the Citco Subscribers was exclusively between two foreign entities and governed by foreign law," and that "BJSS entered into a custody agreement with the Citco Subscribers for the limited purpose of facilitating client-directed investments in certain investment funds." Reply at 12. BJSS further states that the Custody Agreement "does not suggest BJSS availed itself of the protections of U.S. law by engaging the Citco Subscribers to facilitate foreign transactions in foreign investment funds like the fund here." *Id.* In addition, BJSS claims that asserting jurisdiction over BJSS solely because the funds at issue "momentarily transited through the U.S. banking system would effectively establish general jurisdiction in the United States for any global transaction conducted in U.S. Dollars, which is something courts have consistently rejected." *Id.* at 14. Before examining

whether the allegations support jurisdiction, the Court will first consider whether the Citco Subscriber's actions should be imputed to BJSS.

### 1. Whether the Citco Subscriber Acted as an Agent of BJSS for Purposes of Personal Jurisdiction

The Court will first address the Defendant's argument that the Citco Subscriber was not an agent of BJSS because it was an agent of the Fairfield Funds. The Defendant cited the Court's ruling in *Fairfield III*, 2020 WL 7345988 at *7, that "the Funds were customers of Citco Bank[,]" and that Citco Banks "acted as their agents in connection with the securities contracts [related to] the redemption payments …" as support for this argument. *See* Reply at 11, ECF No. 1221 ("Plaintiffs' attempt to deem the Citco Subscriber as BJSS's agent is contrary to Plaintiffs' own theory of the case and this Court's prior rulings."). Although the Plaintiffs did not respond to this argument, the Court will address this issue here.

BJSS apparently assumes that a party cannot be agents of multiple parties. Under this argument, BJSS asserts that, because the Court had found that the Citco Subscriber was the Funds' agent in facilitating the redemption payments, the Citco Subscriber could not simultaneously be an agent of other parties in the same transactions. The Court disagrees. Indeed, the Court has already rejected this argument in prior opinions denying other defendants' motions to dismiss this adversary proceeding. *See Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse AG, et al.* (*In re Fairfield Sentry Ltd.*), 665 B.R. 1, 16–17 (Bankr. S.D.N.Y. 2024); *see also Fairfield Sentry Ltd. (In Liquidation), et al. v. SIX SIS Ltd., et al.* (*In re Fairfield Sentry Ltd.*), 2025 WL 946971, at *10 (Bankr. S.D.N.Y. Mar. 28, 2025). Many courts have long recognized that, where two principals to the same transaction do not have conflicting interests, a third-party may serve as an agent for both principals. *See, e.g., 99 Commercial Street, Inc. v. Goldberg*, 811 F.Supp. 900 (S.D.N.Y. 1993) (holding that an escrow agent can act as agent to both parties); *see also Knudson*

*v. Weeks*, 394 F.Supp. 963 (W.D. Okla. 1975) (holding that an agent may act as an agent for both parties to the same transaction where the interest of two principals are not conflicting). Accordingly, the Court's holding in *Fairfield III* establishing the agency relationship between the Funds and the Citco Subscriber does not necessarily bar the Plaintiffs' allegation the Citco Subscriber served as BJSS's agent with respect to the redemption payments.

Courts have also recognized that a defendant "can purposefully avail itself of a forum by directing its agents . . . to take action there." *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014). In the absence of a formal agency relationship, the Court may impute an agent's conduct within or aimed at the forum to the principal based on "the realities of the relationship in question rather than the formalities of agency law." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986). Even a defendant that "indirectly transacts financial instruments in a forum may have purposefully availed itself of the forum if the transactions were effected by the defendant's agent." *In re Eur. Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *6 (S.D.N.Y. July 23, 2020).

The Court must determine whether the alleged activities of the Citco Subscriber should, for the purposes of establishing specific personal jurisdiction in this Court, be imputed to BJSS. "To establish an agency relationship for jurisdictional purposes, plaintiffs must show that the alleged agent acted in [the forum] for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (citing *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 2018)). The Plaintiffs argue that the Citco Subscriber's conduct satisfies all three prongs of this test, given that "(1) the Citco Subscriber's conduct in investing in the Funds was taken on behalf and for the benefit of BJSS; (2) the Citco Subscriber acted at the direction and under the control of BJSS; and

(3) the Citco Subscriber acted pursuant to BJSS's knowledge and consent.  *See* Opp'n at 17–18,

ECF No. 1105 (citing *In re Eur. Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *6).

The Second Circuit has explained that a principal might not be charged with the acts of an

agent when that agent, "though ostensibly acting in the business of the principal, is really

committing a fraud for his own benefit, he is acting outside the scope of his agency, and it would

therefore be most unjust to charge the principal with knowledge of it."  *Wight v. BankAmerica

Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (quoting *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir.

1936)).  This exception is narrow in that the Court may still charge the principal with "the acts and

knowledge of an agent as long as the agent in some respect served the principal or, stated

differently, unless the agent 'totally abandoned' the principal's interests and 'acted entirely for his

own or another's purpose.'"  *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d at 472 (finding that

although the agent committed fraud "during his term of employment . . . he did it solely to benefit

himself" and that the benefit to his employer was "immaterial because [employer] was the victim

of [the agent]'s fraud.").

### a. <u>Whether the Citco Subscriber's Conduct was Performed on Behalf and for the Benefit of BJSS</u>

In order to establish an agency relationship for purposes of personal jurisdiction, "the

plaintiff must show that the alleged agent acts 'for the benefit of' . . . the non-resident principal . .

. ."  *In re Welspun Litig.*, No. 16 CV 6792 (VB), 2019 WL 2174089, at *7 (S.D.N.Y. May 20,

2019) (quoting *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318

(S.D.N.Y. 2009)); *see also CutCo*, 806 F.2d at 366.  The Plaintiffs argue that the "on behalf/benefit

of prong is satisfied when an agent's activities open the principal to financial gain."  Opp'n at 18,

ECF No. 1105 (citing *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 336 (finding defendants

benefited from agent's trading activities which could result in gain if financially successful); *GEM*

*Advisors, Inc., S.A.*, 667 F. Supp. 2d at 319 (finding benefit where defendant "stood to benefit" from the alleged agent's "actions and contracts by receiving some or all of the sale price")).

BJSS subscribed for shares in the Fairfield Funds through the Citco Subscriber to profit by indirectly investing in BLMIS. *See* Opp'n at 18. Through the activities of its agent, the Citco Subscriber, BJSS could obtain financial gain. *Id*. at 18–19. The Plaintiffs point to a private placement memorandum of the Fairfield Funds that explains that the Fairfield Funds would seek to "obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as 'split strike conversion,'" which would be implemented by Bernard L. Madoff Investment Securities LLC[.]" *Id.* at 7 (quoting Kononova Decl. Ex. 6 at -333, -334, ECF No. 1106). BJSS was the beneficial owner of the shares of Sentry and Sigma that the Citco Subscriber subscribed to pursuant to BJSS's orders. *Id*. at 18. The Citco Subscriber's activity in relation to investing in the Funds opened BJSS, as principal, to financial gain. The Plaintiffs' allegations and supporting documents sufficiently demonstrate that the Citco Subscriber — in implementing the subscription and redemption decisions — acted on behalf of and for the benefit of BJSS in the forum.

### b. Whether BJSS Both Exercised Control Over and Was Aware of and Consented to the Citco Subscriber's Activities

To assert an agency relationship, the principal must have exercised "some control" over the purported agent. *Scholastic, Inc. v. Stouffer*, 2000 WL 1154252, at *5 (S.D.N.Y. Aug. 14, 2000). For the purposes of personal jurisdiction analysis, this control prong is satisfied when the principal has "[an] ability . . . to influence [the agent's] acts or decisions by virtue of the parties' respective roles." *Id.* (citing *Cutco*, 806 F.2d at 366). Control means the "actual exercise of control." *Hau Yin To*, 700 F. App'x at 68. However, absolute control by the principal is not necessary. *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 442 (S.D.N.Y. 2008). The

knowledge and consent prong is satisfied when the principal is apprised of the agent's activities.

*See Struna v. Leonardi*, 626 F. Supp. 3d 657, 664 (S.D.N.Y. 2022). Because certain of the same

facts in this case bear on "knowledge and consent" and "control," the two questions may be

considered simultaneously. *See Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 326 n.6 (S.D.N.Y.

1998) ("The same considerations which lead this Court to conclude that the plaintiffs have not

satisfied the 'control' prong of *Kreutter,* indicate that plaintiffs also have not satisfied the

'knowledge' and 'consent' prongs of the agency test."); *Branham v. ISI Alarms, Inc.,* No. 12-CV-

1012 (ARR) (MDG), 2013 WL 4710588, at *7 (E.D.N.Y. Aug. 30, 2013).

Knowledge and consent of the principal have been found: (i) where an agent forwarded

information to the principal (*Sec. Ins. Co. of Hartford v. ITA Textiles Corp.*, 2000 WL 1576879,

at *2–4 (S.D.N.Y. Oct. 23, 2000)); (ii) where the complaint asserts that the principal received a

policy procured by its agent with a "New York forum selection clause that [the principal] knew or

should have known was included" (*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,

2021 WL 2000371, at *9 (S.D.N.Y. May 19, 2021)); and (iii) where the principal is alleged to have

done nothing after having received a cease-and-desist letter aside from forwarding the letter to

counsel. *Branham*, 2013 WL 4710588, at *7.

The Liquidators argue that BJSS exercised significant control over the Citco Subscriber's

subscription and redemption-related activities and had knowledge of and consented to those

activities such that BJSS was the principal with respect to those transactions and exercised the

requisite control over the Citco Subscriber as its agent. Opp'n at 19, ECF No. 1105. BJSS entered

into the B&C Agreement with the Citco Subscriber in June 1998, pursuant to which BJSS

appointed the Citco Subscriber to act as custodian for its investments. *Id.* at 9; Konanova Decl.

Ex. 14, ECF No. 1106. Under this agreement, the Citco Subscriber could execute subscriptions

21

and redemptions only upon receipt of specific instructions from BJSS. Opp'n at 19. The B&C Agreement also apparently required the Citco Subscriber to issue preliminary and final order confirmations to BJSS and to issue a "pre-advice" statement for each subscription or redemption. *See* Konanova Decl. Ex. 23 (Preliminary Trade Advice); *id.* Ex. 24 (Confirmation of Order Received). Based on the foregoing and the lack of allegations that BJSS objected to these actions or instructed the Citco Subscriber to act differently, the Plaintiffs have sufficiently alleged BJSS's consent to the Citco Subscriber's actions. Having found that it is appropriate to consider the conduct of the Citco Subscriber along with the allegations of BJSS's direct actions, the Court will examine the sufficiency of the alleged contacts.

## 2. __Defendant's Use of Correspondent Accounts__

The Plaintiffs point to BJSS's choice of correspondent accounts, through its agent, as sufficient to establish minimum contacts with the United States. *See* Opp'n at 29–34, ECF No. 1105. "Correspondent accounts are accounts in domestic banks held in the name of foreign financial institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)). Plaintiffs allege that BJSS, through the Citco Subscriber, its purported agent, deliberately selected and used U.S. correspondent accounts through the Citco Subscriber's U.S. correspondent account at HSBC Bank USA, N.A. ("HBUS") to effectuate the redemption payments that form the harms for which Plaintiffs seek redress.[16] Opp'n at 11, 29.

---

[16]    The use of correspondent accounts concerns only the transfers that originated from Sentry. Opp'n at 1 n.2, ECF No. 1105 ("[BJSS] received approximately $3,654,602.87 from Sentry and approximately €730,157.56 from Sigma through the redemption payments at issue."); *id.* at 32 ("[T]he Citco Subscriber repeatedly utilized U.S. correspondent . . .when investing in and receiving redemption payments *from Sentry*.") (emphasis added). The investments in Sigma were in Euros, not U.S. dollars, and therefore did not require the use of U.S. correspondent accounts. *See* Am. Compl. ¶¶ 133–34, ; *see also* Opp'n at 5 ("Sentry transferred its proceeds directly to BLMIS in

Here, the Plaintiffs have shown that the Defendant was able to use either a foreign-based or a U.S.-based correspondent bank account for its redemption requests and, through its alleged agent, chose the latter. *See* Kononova Decl. Ex. 2, ECF No. 1106 (Sentry Confirmation of Order Received to redeem 84.89 shares of Sentry at HSBC Bank USA in New York); *see also id.* Ex. 25 (Sentry Confirmations of Orders Received); *see also* Joyce Decl. at 6–9, ECF No. 1107.; *id.* at 12 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* ("Neither the fact that Fairfield Sentry was a U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* at 12–13 ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

BJSS next argues that any use of correspondent accounts that may have occurred was incidental and insufficiently related to the harm for which the plaintiffs seek redress. *See* Reply at 13–16, ECF No. 1221 ("[The Sentry redemption payments] momentarily transited through the Citco Subscriber's U.S. correspondent bank account.… [T]here is no allegation, let alone evidence, that BJSS or the Citco Subscriber[] provided any unlawful banking services in the [United States]

New York, while Sigma, established for Euro-denominated investments, transferred proceeds to Sentry."); *id.* at 28 n.18 ("While [BJSS] and its agent did not designate a U.S. correspondent account for [BJSS's] redemption of Sigma shares, [BJSS] is still subject to jurisdiction with respect to those transactions as detailed in [arguments concerning BJSSs investment in the Fairfield Funds and other business activity in and directed at the United States]").

that gave rise to Plaintiffs' BVI constructive trust claims."). The Defendant cites the Second

Circuit's opinion in *Hau Yin To*, 700 F.App'x 66, 66–67 (2d Cir. 2017) in support of this argument.

In *Hau Yin To*, the Second Circuit affirmed an earlier ruling by the District Court, which had held

that the defendants' passive use of a U.S.-based correspondent account was not a sufficient basis

to confer personal jurisdiction over those defendants. *Id.* at 69; *see also Hau Yin To v. HSBC

Holding, PLC*, 2017 WL 816136 (Bankr. S.D.N.Y. Mar. 2017). Contrary to the BJSS's argument,

the Second Circuit's opinion in *Hau Yin To* does not support the Defendant's assertion here. As

the District Court noted in its opinion in *Hau Yin To*, the "wiring of funds through New York" by

certain foreign defendants — fund custodians that facilitated the fund transfers between BLMIS

and its feeder funds — was "passive" and "incidental" because "the passage of money through the

U.S. bank accounts …[was] not specifically directed by [the defendants] to facilitate the [BLMIS]

Ponzi scheme." *See Hau Yin To*, 2017 WL 816136 at *7, n. 6.

Here, unlike the plaintiffs in *Hau Yin To*, the Liquidators do not allege that the Defendant,

through its alleged agents, used U.S.-based correspondent accounts to facilitate the BLMIS Ponzi

scheme. Instead, the Liquidators are seeking the imposition of a constructive trust related to

numerous parties — including the Defendant — because the parties, through their alleged agents,

requested and received redemption payments while knowing that the NAV was inflated. *See* Am.

Comp. ¶¶ 205–216, ECF No. 679. Therefore, the Defendant's use of a U.S.-based correspondent

account through its alleged agent for receiving redemption payments is an integral part of the

Liquidators' claim. Moreover, the Plaintiffs have shown that the Defendant had the option to use

a foreign correspondent account for its redemption requests, but instead used the U.S.-based

correspondent account through its alleged agent. *See* Konanova Decl. Ex. 2 (Sentry Redemption

Records); *see also* Joyce Decl. at 5–9, 11–13.

The Plaintiffs allege that Defendant received 14 redemption payments from Sentry that the Citco Subscriber requested to be sent to a correspondent account at HBUS.  *See* Opp'n at 12–13. The Plaintiffs also support their allegations with certain redemption requests and order confirmations that correspond to certain redemption payments.  *See* Konanova Decl. Ex. 2 (Sentry Redemption Records).

While some records of redemption requests may "indicate" that a payment was sent directly from Sentry to Citco Bank Dublin Branch in Dublin, Ireland, other records from the same exhibit show requests seeking payments to be made to correspondent accounts in New York or confirmations of orders received at those accounts.  *Compare id.* Ex. 2 at -469 ("Request for Wire Transfer Payment" dated September 18, 2007, for 85.47 shares of Sentry worth $107,469.69 to be made to Citco Bank Nederland N.V. Dublin Branch with an address listed in Dublin, Ireland); *id.* Ex. 2 at -526 (July 26, 2007, request bearing the same transaction reference number for redemption of 85.47 shares of Sentry to be made to "HSBC BANK USA . . . NEW YORK, NY . . . UNITED STATES OF AMERICA"); *id.* Ex. 2 at -525  (August 2, 2007, "Confirmation of Order Received" bearing the same transaction reference number for redemption of 85.47 shares of Sentry at "HSBC BANK USA … NEW YORK … USA").

Indeed, this was no passive endeavor; the Plaintiffs allege that Defendant "and its agent *frequently* used U.S. correspondent accounts in transacting with Sentry."  Opp'n at 32 (emphasis in original).  Defendant did so repeatedly, using U.S.-based correspondent accounts on twenty-four occasions to make ten subscription payments and to receive fourteen redemption payments worth $3,654,602.87 in total from Sentry.  *See id.*; *see also* Konanova Decl. Exs. 2, 21, 25 (Subscription and Redemption Records).  The Defendant actively selected the correspondent account as a means of moving redemption funds through New York.  *See* Joyce Decl. at 8–9 (listing

multiple "correspondent banks offer[ing] U.S. dollar correspondent accounts located outside of the U.S." during the relevant period). Defendant was free to designate an account of its choice, inside the United States or outside, to effectuate transfers and chose one based in the U.S. to receive redemption payments. *See id.* at 9–11 ("Factors Influencing Choice of Correspondent Account").

BJSS, through its agent, accomplished the conduct at the heart of the Liquidators' claims regarding payments from Sentry through its use of the U.S.-based correspondent accounts. The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations supports a finding of sufficient minimum contacts. *Licci IV*, 732 F.3d at 171; *id.* at 168 (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (N.Y. 2012) ("[A] foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States."); *see also Spetner*, 70 F.4th at 640 ("[A] defendant foreign bank's 'repeated use of a correspondent account in New York on behalf of a client . . . can constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum.").[17] A course of dealing can be established through as little as "14 currency exchange transactions between" two foreign entities made through a New York bank. *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 325 (2016).

The Liquidators have provided support for the allegation that the Citco Subscriber, acting as agent of the Defendant, chose to use a correspondent account in New York to receive payments from Sentry. *See* Opp'n at 13 ("[T]he Citco Subscriber instructed Sentry to wire the redemption

---

[17]    Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an agent." 70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

payments to the Citco Subscriber's U.S. correspondent account at HBUS."). While foreign options existed, the redemption forms show that Defendant selected and used a U.S.-based correspondent bank receive payments from Sentry. BJSS's repeated receipt of millions of dollars of redemption payments for its investments in Sentry through U.S. correspondent accounts demonstrates its purposeful availment of the banking system of New York and the United States.

### 3.   Defendant's Business Contacts with the Forum

The Liquidators assert that BJSS "intentionally invested in BLMIS feeder funds Sentry and Sigma knowing that the Funds were designed to subsequently invest that money in New York-based BLMIS. [BJSS] is subject to this Court's jurisdiction with respect to its Sentry and Sigma redemptions as a result of that conduct." Opp'n at 21, ECF No. 1105. Defendant describes the allegations concerning Defendant's subscription payments into the Fairfield Funds for the purpose of investing in BLMIS as the unilateral activity of a third-party, which Defendant argues is not appropriate to consider under *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984). Mem. L. at 8, ECF No. 834; *see also* Reply at 10, ECF No. 1221 ("[T]he law in the Second Circuit is clear that 'foreign banks . . . acting entirely abroad and with only sporadic or indirect contacts with the United States' are not subject to personal jurisdiction unless Plaintiffs establish their injury was 'proximately caused by those contacts.'") (citation omitted).

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros*, 466 U.S. at 418. The Supreme Court found that "one trip" to the forum "for the purpose of negotiating the transportation-services contract . . . cannot be described or regarded as a contact of a 'continuous and systematic' nature . . . ." *Id.* at 416. The Liquidators, however, have described more substantial contacts here.

First, the Liquidators point to the documents given to BJSS by the Fairfield Funds' U.S.-based manager, the Fairfield Greenwich Group ("FGG"), after BJSS communicated about the possibility of subscribing in the Fairfield Funds. *See* Opp'n at 6–8, 23–25. Documents that BJSS received "made clear that the main purpose of the Funds' existence was to invest in BLMIS, a New York-based broker dealer registered in the U.S." *Id.* at 7–8; *see also* Konanova Decl. Ex. 11 at -103 ("The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as 'split strike conversion', to which the Fund allocates the predominant portion of its assets."); Konanova Decl. Ex. 12 at -208, -214 (describing the "Business Objective of the Company" as "achiev[ing] capital appreciation of its assets principally through the utilization of . . . [the] 'split strike conversion'" strategy, which BLMIS would implement); *id.* Ex. 13 at -049 ("As a result of the Investment Manager's selection of Bernard L. Madoff Investment Securities, LLC ('BLM') as execution agent of the split strike conversion strategy, substantially all of the Fund's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian."). These documents show that Defendant was aware at the time that its investments in the Fairfield Funds were effectively investments in BLMIS in New York. BJSS, through its agent, the Citco Subscriber, executed subscriptions into Sentry with this knowledge. *See* Konanova Decl. Ex. 11 (Sentry PPM 1); *id.* Ex. 12 (Sentry PPM 2); *id.* Ex. 13 (Sentry PPM 3); *see also id.* Ex. 17 at -148 (Composite Citco Long Form Subscriptions).

In August 2018, this Court held that it does not have personal jurisdiction over certain defendants due to subscription agreements that provided for consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the Fund." *Fairfield I*, 2018 WL 3756343, at *11. The Liquidators here rely on the subscription agreements and private placement

memoranda not to show consent, but to show that when Defendant invested in Sentry it did so knowing that it would avail itself of the benefits and protections of New York. Opp'n at 21–28. The subscription agreements, signed by BJSS's agent, in this way, support the Plaintiffs' showing of contacts with the forum.

The Plaintiffs have supplied further support for the allegations of contacts. Exhibits indicate that BJSS conducted extensive due diligence prior to and during the subscription period, which information informed it of the relationship between the Fairfield Funds and BLMIS at the time it instructed the Citco Subscriber to invest in the Funds during the relevant period. *See* Opp'n at 23–25; *see also* Konanova Decl. Ex. 6 (June 2008 email from FGG employee with a "fgg.us" email address to a BJSS employee with a "sarasin.ch" email address, which attached tear sheets of Fairfield Sentry explaining the role of BLMIS); *id.* Ex. 9 at -628, -629 (August 2006 email exchange in which a BJSS employee requested from FGG UK certain FGG tear sheets and login information for CitcoFundsNet[18]); *id.* Ex. 30 (June 2005 email exchange between FGG US and BJSS regarding the capacity of Sentry for new investors, subscription and redemption deadlines, and fund performance, attaching "the Offering Memo and Subscription Documents for the Fairfield Sentry Fund"); *id.* Ex. 31 at -406, -407 (April 2007 email exchange between FGG and BJSS regarding scheduling a meeting in Zurich with an FGG US Partner from New York and providing due diligence materials).

---

[18]    The Liquidators describe CitcoFundsNet as "an online portal maintained by the Citco Subscriber." Opp'n at 20, ECF No. 1105. CitcoFundsNet allegedly allowed BJSS to "receive information on [BJSS]'s shares in Sentry under the name of the Citco Subscriber[,]" and submit redemption requests. *See id.* at 12, 20; *see also* Konanova Decl. Ex. 9 at -628, -629, ECF No. 1106 ("[CitcoFundsNet] will then provide access to all FGG Fund information. Monthly Portfolio Update Webcasts with transcripts are available on our website.").

Therefore, the Court finds that the allegations and documentation provided by the Plaintiffs through jurisdictional discovery, taken together, sufficiently demonstrate facts supporting continuous and systemic contacts with the forum.

### 4. Whether the Defendant's Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction

The Court will address BJSS's remaining arguments that the alleged contacts are not jurisdictionally relevant under Supreme Court precedent. Mem. L. at 1215, ECF No. 834. Defendant argues that the Plaintiff's allegation that Citco Brokerage Customers knew funds would be commingled and partially invested in BLMIS accounts in New York is irrelevant to jurisdiction over BJSS. *Id.* at 12. Defendant further argues that because the Supreme Court held in *Helicopteros* that "the unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State[,]" this Court should reject the Plaintiffs' attempt to "satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third-parties) and the forum State[]" under *Walden v. Fiore*, 571 U.S. 277, 284 (2014). *Id.*

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Walden*, 571 U.S. at 289. The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* As the Supreme Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's conduct . . . must form the necessary connection with the forum State." *Id.* at 285. Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investments into BLMIS in New York, selection and use of U.S.-based correspondent accounts, possible interactions with Madoff as described above, demonstrate that BJSS took affirmative actions on its own apart from the conduct of the Plaintiffs. *See* Opp'n at 21–28, ECF No. 1105. The Liquidators have shown that the Defendant knew and intended that, by investing in the Funds, Defendant's money would enter into U.S.-based BLMIS. *Id.* at 30–31; *see also* Kononova Decl. Ex. 10, ECF No. 1106 (Sigma PPM 1). This certainty can be found in the Fairfield Funds' contractual obligation to invest at least 95% of the money they received in U.S.-based BLMIS. *See* Konanova Decl. Ex. 6, at - 352 ("The Investment Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value, measured at the time of investment) to alternative investment opportunities other than its 'split strike conversion' investments."). Moreover, the Plaintiffs have alleged that the Defendant, through its agent, conducted due diligence investigations and benefited from the materials that it received from FGG which confirmed the investments would be made with BLMIS in New York. Opp'n at 25.

The Court thus finds that Defendant's selection and use, through its agent, of U.S. correspondent accounts, due diligence, and communications with FGG concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong. The contacts are not random, isolated, or fortuitous. The contacts demonstrate BJSS's purposeful activities aimed at New York in order to effectuate transfers from Sentry and Sigma. The Plaintiffs have thus provided allegations and supporting documentation that sufficiently support a prima facie showing of jurisdiction over the Defendant.

### C.  WHETHER THE CLAIM ARISES OUT OF OR RELATES TO THE DEFENDANT'S FORUM CONDUCT

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original).  "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required.  *Id.* at 1027.  Instead, a court need only find "an affiliation between the forum and the underlying controversy."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the Plaintiffs' claims are "not premised on whether the redemptions they seek to *recover* were ever placed with or controlled by BLMIS in New York" and are "not premised on any investor's decision to *invest* in the Funds."  Mem. L. at 14, ECF No. 834 (emphasis in original).  However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated.  *See* Am. Compl. ¶¶ 205–16, No. 679.  The issue of knowledge of the inflated NAV is inextricably tied to the Defendant's investments with New York-based BLMIS.  The allegations are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds.  *Id.* ¶ 207.  The Defendant's contacts with the United States, in investing in, in communications with, and redemptions from the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum.  *See MSP Recovery Claims, Series LLC v. Takeda Pharm.*

*Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S.

Ct. at 1032).

### D.  WHETHER ASSERTION OF PERSONAL JURISDICTION IS REASONABLE

If a defendant has sufficient minimum contacts, then the Court must ask "whether the

assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial

justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank*

*Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Where the plaintiff "makes the threshold

showing of the minimum contacts required for [exercising personal jurisdiction], a defendant must

present a compelling case that the presence of some other considerations would render jurisdiction

unreasonable."  *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3 (quoting *Bank*

*Brussels Lambert*, 305 F.3d at 129).  Factors the Court will consider include the burden on the

defendant, the interests of the forum in adjudicating the case, the plaintiff's interest in obtaining

convenient and effective relief, the interstate judicial system's interest in obtaining the most

efficient resolution of controversies, and the shared interest of the states in furthering fundamental

substantive social policies.  *Id.*

The Defendant argues that "the interests of the United States in this dispute between BVI

funds and their foreign investors governed by BVI law are minimal."  Reply at 18, ECF No. 1221.

Further, they argue that this action is "merely an 'ancillary' Chapter 15 proceeding" in which the

Court is acting "to aid foreign jurisdictions in administering bankruptcies . . . ."  *Id.* at 14. (citing

*In re Fairfield Sentry Ltd.*, 458 B.R. 665, 686 (S.D.N.Y. 2011) (Preska, C.J.)).

Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced.  In that case, the District Court determined whether the proceeding was core or non-core; it did not determine whether adjudication or jurisdiction in the United States was reasonable.  *See id.* at 675.  Further, the Court has already found that it has subject matter jurisdiction over these proceedings.  *See Fairfield I*, 2018 WL 3756343, at *8.  Chapter 15 allows for recognition of Sentry's foreign main proceeding.  11 U.S.C. § 1501(a) ("The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency . . . ."); *id.* § 1504 ("A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515.").  Defendant correctly states that cases brought under Chapter 15 are ancillary to foreign proceedings.  *See Fairfield I*, 2018 WL 3756343, at *2.  However, the ancillary character of such cases does not necessarily mean that the United States has minimal interest in the dispute.  Indeed, courts have recognized that the United States has a strong interest in ensuring the integrity of its financial systems, and this Court has repeatedly emphasized such interest in other adversary actions related to the BLMIS Ponzi scheme.  *See Licci IV*, 732 F.3d at 174 ("[T]he United States[] and New York [have an] interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends."); *see also Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Securities Services (Luxembourg) S.A., et al.* (*In re Fairfield Sentry Ltd.*), 658 B.R. 257, 277 (Bankr. S.D.N.Y. 2024); *Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Europe SE, Luxembourg Branch, et al.* (*In re Fairfield Sentry Ltd.*), 657 B.R. 1, 23 (Bankr. S.D.N.Y. 2024).

Defendant further argues that the "Plaintiffs have already conceded that the redemptions at issue were 'purely foreign' and that 'every relevant component of the transactions at issue here

occurred outside the [U.S.].'" Reply at 18.  BJSS suggests that the Liquidators "have no reasonable interest in adjudicating this dispute in the United States beyond the adverse court rulings rendered against them in BVI." *Id.*

The Court disagrees.  Here, the Defendant presumes but fails to establish that the Plaintiffs have no legitimate interest in obtaining relief in the United States — especially considering that this dispute stems from a Chapter 15 proceeding that has intimate connections to the New York-based BLMIS Ponzi scheme.  Defendant has not demonstrated how this forum would fail to provide effective relief.  *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3.  BJSS does not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction.  *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023).

Finally, BJSS also believes that the burden of litigating this dispute in New York is significant for the Defendant, as the "witnesses and evidence related to BJSS are exclusively overseas in Switzerland[.]"  Reply at 19.  Moreover, they argue that the burden of further discovery is "magnified by BJSS's need to comply with Swiss bank secrecy and data protection laws."  *Id.*

In 2012, this Court granted in part and denied in part a motion seeking relief as to the order staying the action and seeking expedited initial disclosures on certain beneficial holders.  *See* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799 (the "July 2012 Bench Ruling").  The Court stated in that ruling that it was "hard-pressed to find any compelling United States' interest in mandating discovery here *at this juncture* of the pending litigation."  *Id.* (emphasis added). Although the defendants before this Court in 2012 were able to describe "the strong and undeniable interest of many nations in enforcing their banking secrecy laws" and "significant bank customer confidentiality laws of no fewer than 30 countries, attested to by numerous declarations of foreign

law experts and letters submitted by foreign governments" that could have been implicated or broken by complying with the Court's prior order, BJSS now describes a potential exposure to liability under Swiss laws. *Id.*; Reply at 19. This Court lifted the stay and required the Defendant to proceed to discovery in 2021. *See* Order Lifting Stay, ECF No. 675. The July 2012 Bench Ruling shows that this Court can alleviate specific burdens identified by a defendant. However, the mere potential for exposure to unspecified liability is not a burden that renders exercise of jurisdiction unreasonable.

The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum. However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023). The Defendant has not established that the Court's exercise of personal jurisdiction over it would be unreasonable. Further, BJSS is represented by U.S. Counsel and the United States has a strong interest in ensuring the integrity of its financial systems. The Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with "traditional notions of fair play and substantial justice . . . ." *See Int'l Shoe*, 326 U.S. at 316, 66 S. Ct. 154.

## V.    <u>**CONCLUSION**</u>

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1.

**IT IS SO ORDERED.**


Dated: May 8, 2025
        New York, New York

                                      /s/ John P. Mastando III
                                      THE HONORABLE JOHN P. MASTANDO III
                                      UNITED STATES BANKRUPTCY JUDGE