UNITED STATES BANKRUPTCY COURT                    *FOR PUBLICATION*
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 |
| Fairfield Sentry Limited, et al. | Case No. 10-13164 (JPM) |
| | (Jointly Administered) |
| Debtors in Foreign Proceedings. | |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 10-03636 (JPM) |
| ABN AMRO SCHWEIZ AG a/k/a AMRO (SWITZERLAND) AG, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO DISMISS

*APPEARANCES:*

**WUERSCH & GERING LLP**
*Attorneys for Defendant, Bank Vontobel AG (as successor to Finter Bank Zurich)*
100 Wall Street, 10th Floor
New York, New York 10005
By:     Gregory F. Hauser
        Joshua A. Dachs


**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs, Joint Liquidators*
Seven Times Square
New York, NY 10036
By:     Jeffrey L. Jonas
        David J. Molton
        Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is the motion of the Defendant, Bank Vontobel AG ("Vontobel"

or "Defendant"), as successor to Finter Bank Zurich ("Finter")[1], to dismiss the Fifth Amended

Complaint (the "Amended Complaint" or "Am. Compl.") for lack of personal jurisdiction.  Mot.

to Dismiss (the "Motion"), ECF[2] No. 856.  The parties did not request oral argument on the

Motion, and instead indicated that they were resting on the papers.  *See Letter re: Status of*

*Remaining Oral Arguments,* Ex. A, ECF No. 1323.  For the reasons set forth herein, the Court

DENIES the Defendant's Motion to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the

Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court

previously concluded that it has subject matter jurisdiction over this and related actions.  *See In re*

*Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*"); *see also*

Stip. Order, ECF No. 577.  Personal jurisdiction is contested by the Defendant and will be

discussed below.

## III.    BACKGROUND

This adversary proceeding was filed on September 21, 2010.  *See* ECF No. 1; *see also*

*Amended Complaint Against All Defendants* (the "Complaint" or "Compl."), ECF No. 8.  Kenneth

M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed

---

[1]    Certain documents referenced in the parties' filings in connection with this Motion referred to Vontobel by the name of its predecessor-in-interest.

[2]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03636-jpm unless otherwise noted.

Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry"),

Fairfield Sigma Limited (In Liquidation) ("Sigma"), and Fairfield Lambda Limited (In

Liquidation) ("Lambda" and, together with Sentry and Sigma, the "Fairfield Funds" or the

"Funds") filed the Amended Complaint on August 12, 2021. *See* Am. Compl., ECF No. 679. Via

the Amended Complaint, the Liquidators seek the imposition of a constructive trust and recovery

of over $1.7 billion in redemption payments made by Sentry, Sigma, and Lambda to various

entities known as the Citco Subscribers. *Id.* ¶¶ 1–2, 205–06; *id.* Exs. A–C.[3] Of that amount,

Defendant allegedly received at least $574,065 through three redemption payments from its

investment in Sentry. *Memorandum of Law in Opposition to Bank Vontobel AG's Motion to

Dismiss* (the "Opposition" or "Opp'n") at 1, ECF No. 1184; *see also Declaration of David J.

Molton in Support of Liquidators' Opposition to Bank Vontobel AG's Motion to Dismiss* ("Molton

Decl.") Exs. 9, 10, ECF No. 1185 (Redemption Records).

## A.  THE BLMIS PONZI SCHEME

This adversary proceeding arises out of the decades-long effort to recover assets of the

Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[4] *See* Am. Compl. ¶ 1,

ECF No. 679. The Citco Subscribers allegedly invested, either for their own account or for the

account of others, into several funds — including Sentry, Sigma, and Lambda — that channeled

investments into BLMIS. *Id.* ¶¶ 2, 5, 15.

---

[3]     At the time of the filing of the Amended Complaint, the Plaintiffs made no specific allegations as to the exact amounts received by any of the beneficial shareholders.  With respect to Vontobel, the Amended Complaint states in relevant part that "[b]ased on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Finter Bank Zurich." Am. Compl. ¶74.  The Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers. *Id.* ¶¶ 34–112. This opinion concerns only those payments that the Plaintiffs allege were paid to Vontobel or Finter.

[4]     The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that scheme have been recounted by many courts. *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue. *Id.* ¶¶ 5; 133–34; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund— what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and then invests the money."). Fairfield Sigma and Lambda, in contrast, were indirect feeder funds, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currencies. *See* Am. Compl. ¶¶ 133–34. BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme. *Id.* ¶¶ 5–7, 13. Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart. *Id.* ¶¶ 7–8, 12–14, 134.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV"). *Id.* ¶ 7. The Citco Subscribers and the beneficial shareholders were allegedly such investors. *Id.* To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 136. In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 137. The money sent to BLMIS by the Fairfield Funds for the purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id*. The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares. *Id.* ¶ 139. The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments. *Id*.

Vontobel's predecessor-in-interest Finter was a "corporate entity organized under the laws of Switzerland" with a registered address in Chiasso, Switzerland.  *Id.* ¶ 74.  Vontobel allegedly invested into and redeemed shares of Sentry and Sigma through "several companies within the Citco corporate family."  Opp'n at 5, ECF No. 1184.  Investments into the Funds were registered in the name of Citco Fund Services (Europe) B.V., and Citco Global Custody N.V (together, "Citco Global Custody").  *Id.*  Citco Bank Nederland N.V. Dublin Branch ("Citco Bank") allegedly carried out subscriptions and redemptions on behalf of Vontobel and other investors.  *Id.*  Citco Bank and Citco Global Custody (collectively, the "Citco Subscriber")[5] served as the subscriber of record for  Vontobel's shares of the Fairfield Funds.  *See id.* at 5–6.  The Citco Subscriber was organized under the laws of either Curaçao or the Netherlands.  *See Bank Vontobel AG's Memorandum of Law in Support of its Motion to Dismiss for Lack of Personal Jurisdiction* (the "Memorandum of Law" or "Mem. L.") at 6–7 n.11, ECF No. 857.

Vontobel invested in two Fairfield feeder funds – Sentry and Sigma – in or about 2001 via the Citco Subscriber, which is alleged to have facilitated investments in the Fairfield Funds for numerous shareholders in this proceeding.  Opp'n at 6–7.  In connection with such investments, Vontobel opened an account at Citco Bank.  *Id.*  Further, Vontobel also "'appoint[ed] and authori[zed] [Citco Bank] to provide Brokerage Services,' which included 'the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of [Citco Bank], or of the [Citco Global Custody], or any nominee for the account of [Vontobel]' and

---

[5]    The Court will refer to the "Citco Subscriber" in this opinion as it is defined by the Plaintiffs in their opposition memorandum.  *See* Opp'n at 5, ECF No. 1184.  The Amended Complaint refers to the "Citco Subscribers," a term that is defined to include both Citco Bank and Citco Global Custody, as relevant to this motion, and other Citco banking and custody entities.  *See* Am. Compl. ¶ 8, ECF No. 679 (defining the Citco Subscribers to include Citco Global Custody NV, Citco Global Custody (NA) NV, Citco Fund Services (BVI), Citco Fund Services (Europe) BV, Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch (a wholly owned subsidiary of Citco Bank Nederland N.V.), and the Citco Banking Corporation N.V.).

'any services ancillary thereto as set out in the [B&C Agreement].'" *Id.* at 8; *see* Molton Decl. Ex. 4 at -993--994, ECF No. 1185 ("B&C Agreement"). The B&C Agreement further empowered and obligated the Citco Subscriber, when instructed to do so by Vontobel, "to make settlement of transactions undertaken by or for [Vontobel]" and to "deliver[] or receiv[e] the Securities or other assets of [Vontobel] and mak[e] or receiv[e] payments for the account of [Vontobel]." *Id* at 8; *see* Molton Decl. Ex. 4 at -899. Vontobel allegedly retained the Citco Subscriber as its agent by September 2000 when the parties entered into this B&C Agreement. *See* Opp'n at 8–9.

Through the Citco Subscriber, Vontobel allegedly subscribed for shares of Sentry and Sigma. *See* Opp'n at 3. Vontobel, through the Citco Subscriber, redeemed at least $574,065.70 through 3 redemptions from Sentry from November 2005 through March 2007. *See* Opp'n at 13; *see also* Molton Decl. Exs. 9, 10, 12 (Redemption Records). In addition to these redemption payments, Vontobel allegedly received retrocession fees and/or trailer fees from the Fairfield Funds' U.S.-based manager, the Fairfield Greenwich Group ("FGG") for investing in the Funds. *See* Opp'n at 14; *see also* Molton Decl. Exs. 11, 13 (Email exchanges between Finter and FGG employees discussing the collection of trailer fees). At the directions and instructions of the Citco Subscriber, as the alleged agent of Vontobel, all three "Redemption Payments were received at … designated United States-based bank accounts." Am. Compl. ¶ 141.

Bernard Madoff was arrested for alleged violations of federal securities laws on December 11, 2008. *Id*. ¶ 193. The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme. *Id*. On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id*. ¶ 194. In March 2009, Madoff pleaded guilty to criminal charges against him and confessed

to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 195–96. Madoff was sentenced to 150 years in federal prison and died in April 2021. *Id.* ¶ 197.

The Amended Complaint alleges that the Citco Subscribers, including the purported agents of Vontobel, "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made. *Id.* ¶ 209. The Amended Complaint further asserts that, while receiving redemption payments, the Citco Subscribers "uncovered multiple additional indicia that Madoff was engaged in some form of fraud" but "turned a blind eye, [and] accept[ed] millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the law of the British Virgin Islands . . . ." *Id.* ¶¶ 8, 209. These indicia included verification that there was no "independent confirmation that BLMIS-held assets even existed," Madoff's failure to segregate duties, and BLMIS's "employing an implausibly small auditing firm" rather than a reliable auditor. *Id.* ¶¶ 9, 209. In the face of red flags such as these, the Citco Subscribers and other Citco entities purportedly "quietly reduced [their] own exposure to BLMIS through the Funds, and significantly increasing its Custodian fees to offset the risk." *Id.* ¶ 209.

## B. **THE PRIOR LITIGATION AND PROCEDURAL HISTORY**

The Fairfield Funds were put into liquidation in the BVI in 2009. Am. Compl. ¶¶ 26–29, ECF No. 679. The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 29. Pursuant to the appointment order of the BVI court,[6] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 203.

---

[6]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See* Am. Compl. at 1, ECF No. 679.

The Liquidators commenced actions in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme. Mem. L. at 4, ECF No. 857; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings. Am. Compl. ¶ 30. This Court granted that recognition on July 22, 2010. *Id.* All cases filed by the Plaintiffs were administratively consolidated before this Court in November 2010. *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

The Plaintiffs asserted multiple causes of action in those consolidated adversary proceedings including, *inter alia*, mistaken payment and constructive trust.[7] Compl. ¶¶ 63–86, ECF No. 8; *see also* 630 F. Supp. 3d at 479. In October 2011, this Court stayed the U.S. proceedings pending resolution of the BVI proceedings. *See* Am. Order Staying Redeemer Actions, Adv. Pro. No. 10-03496, ECF No. 418; *Fairfield I*, 2018 WL 3756343, at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for restitution based on mistaken payment. *Fairfield Sentry Ltd. (In Liquidation) v. Migani*, [2014] UKPC 9 ("*Migani*").[8] The Privy Council held that the Plaintiffs' claims for restitution in the BVI

---

[7]    Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the implied covenant of good faith and fair dealing. *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, (S.D.N.Y. 2022).

[8]    *Migani* is available at https://jcpc.uk/uploads/jcpc_2012_0061_judgment_416722c30e.pdf and, without numbered paragraphs, on Westlaw at *Fairfield Sentry Ltd.* (*In Liquidation*) *v. Migani*, 2014 WL 1219748 (UKPC, Apr. 16, 2014).

to recover redemption payments arising out of transactions governed by the Funds' Articles of Association are governed by BVI law. *Id.* ¶ 17. The Plaintiffs' claims to recover redemption payments thus depended on whether Sentry was bound to make those payments under the "true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption." *Id.* ¶ 19. The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption. *Id.* ¶ 21. The redemption payments made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken. *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates. *See Fairfield I*, 2018 WL 3756343, at *5–6. Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time. *See id.* at *6. The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith. *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295. Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called "Knowledge Defendants" to proceed:

> The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust.

*Id.* at 301. In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022). The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. Mot. to Amend, ECF No. 618; Mot. to Amend, Adv. Pro. No. 10-03496, ECF No. 3737. On August 5, 2021, this Court granted the motion to amend the complaint and lifted the stay of the redeemer actions. *See* Order Granting Mot. to Amend, ECF No. 676; *see also* Order Lifting Stay of Redeemer Actions, ECF No. 675.

## C. <u>THE PENDING MOTION</u>

The Amended Complaint seeks the imposition of a constructive trust on the redemption payments received from the Fairfield Funds. *See* Am. Compl. ¶ 205, ECF No. 679. The Amended Complaint alleges that Defendant's purported agent, the Citco Subscriber, had knowledge of the fraud at BLMIS and therefore knowledge that the NAV was inflated. *Id.* ¶ 209. "By reason of their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been unjustly enriched to the detriment of the [Fairfield] Funds and other shareholders and creditors of the Funds." [9] *Id.* ¶ 213.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully

---

[9]    As stated *supra*, footnote 3, the Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers. Am. Compl. ¶¶ 34–112, ECF No. 679.

blinds himself to that fact." *Id.* ¶ 206 (citing *Fairfield II*, 596 B.R. at 293). As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, "the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and third, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty."

*Fairfield IV*, 2021 WL 771677, at *3 (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the defendants, including Vontobel as a beneficial shareholder of certain accounts, purposefully availed themselves of the laws of the United States and the State of New York by "investing money with the Funds, and knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS." Am. Compl. ¶ 20, ECF No. 679.

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022. *See* Scheduling Order, ECF No. 714; Second Am. Scheduling Order, ECF No. 997. Merits document and expert discovery is ongoing in this case. *See* Fourteenth Am. Scheduling Order, ECF No. 1321; *see also* Fifteenth Am. Scheduling Order, ECF No. 1336.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 10–12 ECF No. 857.

The Liquidators filed an opposition to the Motion and submitted the declarations of David J. Molton and Sara K. Joyce in support of their opposition. *See* Opp'n, ECF No 1184; Molton

Decl., ECF No. 1185; *Declaration of Sara K. Joyce* ("<u>Joyce Decl.</u>"), ECF No. 1186.[10]    The

Liquidators argue that exercising jurisdiction over Defendant would be reasonable and that

Defendant's contacts with the United States, through its own actions and those of its purported

agent, in knowingly and intentionally investing in Sentry, using U.S. correspondent accounts to

invest in and receive payments from Sentry, and conducting other business activities support

personal jurisdiction. Opp'n at 1–4.    Defendant filed a reply memorandum on August 10, 2023.

*Reply Memorandum of Law in Further Support of Bank Vontobel's Motion to Dismiss for Lack of*

*Personal Jurisdiction* (the "<u>Reply</u>"), ECF No. 1274.    In considering the Defendant's Motions, the

Court has reviewed the above filings, all other relevant submissions, and the record as a whole.

## IV.    <u>DISCUSSION</u>

### A.    <u>THE LAW OF PERSONAL JURISDICTION</u>

To subject a defendant to personal jurisdiction in the United States, courts have generally

recognized that due process requires that the defendant have sufficient minimum contacts with the

forum in which the defendant is sued "'such that the maintenance of the suit does not offend

traditional notions of fair play and substantial justice.'"    *See, e.g., Picard v. Bureau of Labor Ins.*

(*In re BLMIS*), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*,

326 U.S. 310, 316 (1945)).    Further, "[w]hen jurisdiction is satisfied through Bankruptcy Rule

7004,[11] a bankruptcy court need not address its state's long-arm statute."    *Picard v. Fairfield*

*Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 n.12 (Bankr. S.D.N.Y. 2021)

---

[10]    Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal.  For the analysis in this opinion, the Court will refrain from referring to any bank account numbers or names of individual employees, named only in sealed documents, in full.

[11]    "The summons and complaint and all other process except a subpoena may be served anywhere in the United States." Fed. R. Bankr. P. 7004(d).  A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States." Fed. R. Bankr. P. 7004(f).

(citing *In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)); *see also Owens-Illinois, Inc. v. Rapid Am. Corp.* (*In re Celotex Corp.*), 124 F.3d 619, 630 (4th Cir. 1997). Accordingly, in assessing personal jurisdiction for bankruptcy adversary proceedings, courts have previously inquired into "whether the defendant has minimum contacts with the United States, rather than with the forum state." *Fairfield Greenwich Grp.*, 627 B.R. at 565 n.13 (citing *Lehman Bros. Holdings Inc.*, 535 B.R. at 619).

However, the United States Supreme Court's recent ruling in *Fuld, et al. v. Palestine Liberation Organization, et al.*, 606 U.S. __, 145 S. Ct. 2090, 2025 WL 1716140 (June 20, 2025) altered the personal jurisdictional analysis, at least in certain cases. In *Fuld*, the Supreme Court held that, for the purposes of determining specific personal jurisdiction:

> Because the State and Federal Governments occupy categorically different sovereign spheres, we decline to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment. Rather, the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority.

*Id.* at *8. The Supreme Court's ruling in *Fuld* essentially separated the analysis for "due process" under the Fourteenth and Fifth Amendments. *See id.* Further, the Supreme Court also refrained from promulgating a new standard that would "delineate the outer bounds of the Federal Government's power…." *Id.* at *9. This Court entered an Order Regarding Supplemental Submissions on June 24, 2025, and directed the parties to submit supplemental briefing on the impact of the Supreme Court's ruling in *Fuld* on the pending Motion. *See Order Regarding Supplemental Submissions*, ECF No. 1389. The parties filed their supplemental letter briefs on June 27, 2025. *See Plaintiffs' Letter re: Fuld v. Palestine Liberation Organization* (the "Plaintiffs' Letter"), ECF No. 1391; *Defendants' Joint Letter re: Fuld v. Palestine Liberation Organization* (the "Defendant's Letter"), ECF No. 1392.

In the Plaintiffs' Letter, the Liquidators argue that the Supreme Court's ruling in *Fuld* "offered [] an alternate basis for satisfying [specific personal jurisdiction under] the Fifth Amendment." Plaintiffs' Letter at 3. Specifically, the Liquidators argue that because "'minimum contacts' … is *not* required to satisfy Fifth Amendment due process standards for personal jurisdiction [post-*Fuld*,]" the Fifth Amendment's due process standard "could be satisfied under a mere 'reasonable' showing." *Id.* at 2 (emphasis in original, quoting *Fuld*, 2025 WL1716140, at 12–13). Vontobel disagrees with the Liquidators' interpretation of *Fuld*, and argues in the Defendant's Letter that "*Fuld* has no impact on the pending [Motion]" because, *inter alia*, "[u]nlike *Fuld*, this case does not involve a specific statutory conferral of jurisdiction…." Defendant's Letter at 1, 3.

As evidenced by the parties' arguments, the effect of the Supreme Court's ruling in *Fuld* in cases that do not involve a specific statutory conferral of personal jurisdiction will be developed over time. Here, having considered the Supreme Court's reasoning in *Fuld*, and the parties' positions on this issue, the Court will begin its analysis by examining, as it has done in prior opinions, the Defendant's minimum contacts, as any defendants that have sufficient minimum contacts with the forum would also satisfy the more flexible personal jurisdictional standards set forth in *Fuld*.

An analysis of minimum contacts "focuses on the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted).

There are three conditions necessary for the Court to exercise specific jurisdiction[12] over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2), the Plaintiffs "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Following discovery, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball*, 902 F.2d at 197. "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the plaintiff

---

[12]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction. A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). The Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Opp'n at 4, ECF No. 1184 (arguing that "[t]he factual nexus between Vontobel's forum contacts and the Liquidators' claims more than sufficiently supports the exercise of specific personal jurisdiction.").

need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85). "Now that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy." *Averbach,* 2023 WL 5016884, at *6 (citing *Dorchester Fin. Sec.*, 722 F.3d at 85). "Plaintiffs need only show that their prima facie showing of jurisdiction is factually supported." *Id.* at *6. When considering a motion to dismiss before or after jurisdictional discovery has taken place, "the court must 'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at 197).

## B.  <u>ANALYSIS OF PURPOSEFUL AVAILMENT</u>

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci IV*")). For specific personal jurisdiction, "'[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the forum.'" *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)). "Although a defendant's contacts with the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*, 571 U.S. at 134) (alteration in original). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated

contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction."
*Id.*

Vontobel asserts that the Liquidators "affirmatively represented to the District Court that all Redemption Payments to Citco's Brokerage Customers (including Vontobel) occurred outside the United States . . . ." Mem. L. at 15–16, ECF No.857. Plaintiffs argued before the District Court that "every relevant component of the [redemption] transactions at issue here occurred ***outside the territorial jurisdiction of the United States***." *Id.* at 3 (emphasis in original); *see also Plaintiffs-Appellants' Opening Brief for Second-Round Appeal* at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief"). The Plaintiffs' Opening Brief concerned the extraterritorial application of the § 546(e)[13] safe harbor. *See* Opening Brief at 24 (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States.").

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co.* (*In re Ampal-Am. Israel Corp.*), 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of,

---

[13]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ." 11 U.S.C. § 546(e). "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer." *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test." *Licci IV*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

The Plaintiffs allege that Citco acted as an agent of the Defendant with respect to its investments with the Fairfield Funds. *See* Opp'n at 2, ECF No. 1184. Many of the jurisdictional contacts that the Plaintiffs refer to rely on this agency relationship. *Id.* at 2–3. The Defendant argues that the Plaintiffs' attempt to deem the Citco Subscribers as Vontobel's agent "directly contradict[s] the Liquidators' own theory of the case [and] is also unsupported by case law." Reply at 4, ECF No.1274. The Court has already found that "the Funds were customers of Citco Bank who acted as their agents in connection with the securities contracts pursuant to which the redemption payments were made ...." *Fairfield III*, 2020 WL 7345988, at *7. Vontobel contends that "this dispute is between foreign (BVI) funds and their foreign investors, governed by foreign law." and that Vontobel entered into a custody agreement with the Citco Subscribers "only … to facilitate client-directed investments in certain foreign investment funds." Reply at 11, 5. Vontobel further states that the Custody Agreement and the other exhibits put forth by the Plaintiffs

"do not establish that Vontobel availed itself of the laws of the United States (or New York), as it has been previously established that neither the forum selection clause in the B&C Agreement, nor the use of a U.S. correspondent bank account, nor mere electronic communications with individuals in the U.S. are sufficient to establish jurisdiction." *Id.* at 1–2. In addition, Vontobel claims that asserting jurisdiction over Vontobel solely because the funds at issue "momentarily passed through the U.S. correspondent accounts of Sentry and the Citco Subscriber before reaching Vontobel" is unwarranted. *Id.* at 8. Before examining whether the allegations support jurisdiction, the Court will first consider whether the Citco Subscriber's actions should be imputed to Vontobel.

### 1.  Whether the Citco Subscriber Acted as an Agent of Vontobel for Purposes of Personal Jurisdiction

The Court will first address the Defendant's argument that the Citco Subscriber was not an agent of Vontobel because it was an agent of the Fairfield Funds. The Defendant cited the Court's ruling in *Fairfield III*, 2020 WL 7345988 at *7, that "the Funds were customers of Citco Bank[,]" and that Citco Bank "acted as their agents in connection with the securities contracts [related to] the redemption payments …" as support for this argument. *See* Reply at 4, ECF No. 1274 ("[T]he law of the case has already determined that Citco Bank acted as the *Funds*' agent, not its customers' (such as Vontobel).") (emphasis in original). Although the Plaintiffs did not respond to this argument, the Court will address this issue here.

Vontobel apparently assumes that a party cannot be agents of multiple parties. Under this argument, Vontobel asserts that, because the Court had found that the Citco Subscriber was the Funds' agent in facilitating the redemption payments, the Citco Subscriber could not simultaneously be an agent of other parties in the same transactions. The Court disagrees. Indeed, the Court has already rejected this argument in prior opinions denying other defendants' motions to dismiss this adversary proceeding. *See Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit*

*Suisse AG, et al.* (*In re Fairfield Sentry Ltd.*), 665 B.R. 1, 16–17 (Bankr. S.D.N.Y. 2024); *see also Fairfield Sentry Ltd. (In Liquidation), et al. v. SIX SIS Ltd., et al.* (*In re Fairfield Sentry Ltd.*)*,* 2025 WL 946971, at *10 (Bankr. S.D.N.Y. Mar. 28, 2025).  Many courts have long recognized that, where two principals to the same transaction do not have conflicting interests, a third-party may serve as an agent for both principals.  *See, e.g., 99 Commercial Street, Inc. v. Goldberg*, 811 F.Supp. 900 (S.D.N.Y. 1993) (holding that an escrow agent can act as agent to both parties); *see also Knudson v. Weeks*, 394 F.Supp. 963 (W.D. Okla. 1975) (holding that an agent may act as an agent for both parties to the same transaction where the interest of two principals are not conflicting).  Accordingly, the Court's holding in *Fairfield III* establishing the agency relationship between the Funds and the Citco Subscriber does not necessarily bar the Plaintiffs' allegation the Citco Subscriber served as Vontobel's agent with respect to the redemption payments.

Courts have also recognized that a defendant "can purposefully avail itself of a forum by directing its agents . . . to take action there."  *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014).  In the absence of a formal agency relationship, the Court may impute an agent's conduct within or aimed at the forum to the principal based on "the realities of the relationship in question rather than the formalities of agency law."  *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986).  Even a defendant that "indirectly transacts financial instruments in a forum may have purposefully availed itself of the forum if the transactions were effected by the defendant's agent."  *In re Eur. Gov't Bonds Antitrust Litig.,* 2020 WL 4273811, at *6 (S.D.N.Y. July 23, 2020).

The Court must determine whether the alleged activities of the Citco Subscriber should, for the purposes of establishing specific personal jurisdiction in this Court, be imputed to Vontobel.  "To establish an agency relationship for jurisdictional purposes, plaintiffs must show that the alleged agent acted in [the forum] for the benefit of, with the knowledge and consent of, and under

some control by, the nonresident principal." *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (citing *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 2018)). The Plaintiffs argue that the Citco Subscriber's conduct satisfies all three prongs of this test, given that "(1) the Citco Subscriber's conduct in investing in the Funds was taken on behalf and for the benefit of Vontobel; (2) the Citco Subscriber acted at the direction and under the control of Vontobel; and (3) the Citco Subscriber acted pursuant to Vontobel's knowledge and consent." *See* Opp'n at 17–18, ECF No. 1184 (citing *Eur. Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *6).

The Second Circuit has explained that a principal might not be charged with the acts of an agent when that agent, "though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (quoting *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936)). This exception is narrow in that the Court may still charge the principal with "the acts and knowledge of an agent as long as the agent in some respect served the principal or, stated differently, unless the agent 'totally abandoned' the principal's interests and 'acted entirely for his own or another's purpose.'" *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 472 (S.D.N.Y. 2010) (finding that although the agent committed fraud "during his term of employment . . . he did it solely to benefit himself" and that the benefit to his employer was "immaterial because [employer] was the victim of [the agent]'s fraud.").

     a.   <u>Whether the Citco Subscriber's Conduct was Performed on Behalf and for the Benefit of Vontobel</u>

To establish an agency relationship for purposes of personal jurisdiction, "the plaintiff must show that the alleged agent acts 'for the benefit of' . . . the non-resident principal . . . ." *In re*

20

*Welspun Litig.*, No. 16 CV 6792 (VB), 2019 WL 2174089, at *7 (S.D.N.Y. May 20, 2019) (quoting

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318 (S.D.N.Y. 2009)); *see*

*also CutCo*, 806 F.2d at 366. The Plaintiffs argue that the "on behalf/benefit of prong is satisfied

when an agent's activities open the principal to financial gain." Opp'n at 18, ECF No. 1184 (citing

*In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 336 (finding defendants benefited from agent's

trading activities, which could result in gain if financially successful); *GEM Advisors, Inc., S.A.*,

667 F. Supp. 2d at 319 (finding benefit where defendant "stood to benefit" from the alleged agent's

"actions and contracts by receiving some or all of the sale price")).

      Vontobel subscribed for shares in the Fairfield Funds through the Citco Subscriber to profit

by indirectly investing in BLMIS. *See* Opp'n at 18–19. Through the activities of its agent, the

Citco Subscriber, Vontobel could obtain financial gain. *Id*. The Plaintiffs point to the private

placement memorandum of the Fairfield Funds that explains that the Fairfield Funds would seek

to "achieve capital appreciation of its assets by allocating its assets to an account at Bernard L.

Madoff Investment Securities [], a registered broker-dealer in New York" that would employ the

'split strike conversion' strategy." *Id.* at 23–24 (quoting Molton Decl. Ex. 2 at -953 , ECF No.

1185). Vontobel was the beneficial owner of the shares of Sentry and Sigma that the Citco

Subscriber subscribed to pursuant to Vontobel's orders. *Id*. at 18. The Citco Subscriber's activity

in relation to investing in the Funds opened Vontobel, as principal, to financial gain. The

Plaintiffs' allegations and supporting documents sufficiently demonstrate that the Citco Subscriber

— in implementing the subscription and redemption decisions — acted on behalf of and for the

benefit of Vontobel in the forum.

b.  Whether Vontobel Both Exercised Control Over and Was Aware of and
Consented to the Citco Subscriber's Activities

To assert an agency relationship, the principal must have exercised "some control" over
the purported agent. *Scholastic, Inc. v. Stouffer*, 2000 WL 1154252, at *5 (S.D.N.Y. Aug. 14,
2000).  For the purposes of personal jurisdiction analysis, this control prong is satisfied when the
principal has "[an] ability . . . to influence [the agent's] acts or decisions by virtue of the parties'
respective roles." *Id.* (citing *Cutco*, 806 F.2d at 366).  Control means the "actual exercise of
control." *Hau Yin To*, 700 F. App'x at 68.  However, absolute control by the principal is not
necessary. *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 442 (S.D.N.Y. 2008).  The
knowledge and consent prong is satisfied when the principal is apprised of the agent's activities.
*See Struna v. Leonardi*, 626 F. Supp. 3d 657, 664 (S.D.N.Y. 2022).  Because certain of the same
facts in this case bear on "knowledge and consent" and "control," the two questions may be
considered simultaneously.  *See Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 326 n.6 (S.D.N.Y.
1998) ("The same considerations which lead this Court to conclude that the plaintiffs have not
satisfied the 'control' prong of *Kreutter,* indicate that plaintiffs also have not satisfied the
'knowledge' and 'consent' prongs of the agency test."); *Branham v. ISI Alarms, Inc.,* No. 12-CV-
1012 (ARR) (MDG), 2013 WL 4710588, at *7 (E.D.N.Y. Aug. 30, 2013).

Knowledge and consent of the principal have been found: (i) where an agent forwarded
information to the principal (*Sec. Ins. Co. of Hartford v. ITA Textiles Corp.*, 2000 WL 1576879,
at *2–4 (S.D.N.Y. Oct. 23, 2000)); (ii) where the complaint asserts that the principal received a
policy procured by its agent with a "New York forum selection clause that [the principal] knew or
should have known was included" (*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
2021 WL 2000371, at *9 (S.D.N.Y. May 19, 2021)); and (iii) where the principal is alleged to have

done nothing after having received a cease-and-desist letter aside from forwarding the letter to counsel. *Branham*, 2013 WL 4710588, at *7.

The Liquidators argue that Vontobel exercised significant control over the Citco Subscriber's subscription and redemption-related activities and had knowledge of and consented to those activities such that Vontobel was the principal with respect to those transactions and exercised the requisite control over the Citco Subscriber as its agent. Opp'n at 19–20, ECF No. 1184. Vontobel entered into the B&C Agreement with the Citco Subscriber in September 2000, pursuant to which Vontobel appointed the Citco Subscriber to act as custodian for its investments. *Id.* at 8; Molton Decl. Ex. 4, ECF No. 1185. Under this agreement, the Citco Subscriber could execute subscriptions and redemptions only upon receipt of specific instructions from Vontobel. Opp'n at 8. The B&C Agreement also apparently required the Citco Subscriber to issue preliminary and final order confirmations to Vontobel. *See* Molton Decl. Ex. 10 (Confirmation of Order Received). Based on the foregoing and the lack of allegations that Vontobel objected to these actions or instructed the Citco Subscriber to act differently, the Plaintiffs have sufficiently alleged Vontobel's consent to the Citco Subscriber's actions. Having found that it is appropriate to consider the conduct of the Citco Subscriber along with the allegations of Vontobel's direct actions, the Court will examine the sufficiency of the alleged contacts.

### 2. **Defendant's Use of Correspondent Accounts**

The Plaintiffs point to Vontobel's choice of correspondent accounts, through its agent, as sufficient to establish minimum contacts with the United States. *See* Opp'n at 29–35, ECF No. 1184. "Correspondent accounts are accounts in domestic banks held in the name of foreign financial institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)). Plaintiffs

allege that Vontobel, through the Citco Subscriber, its purported agent, deliberately selected and used U.S. correspondent accounts through the Citco Subscriber's U.S. correspondent account at HSBC Bank USA, N.A. ("HBUS") to effectuate the redemption payments that form the harms for which Plaintiffs seek redress.  Opp'n at 12–13, 30.

Here, the Plaintiffs have shown that the Defendant was able to use either a foreign-based or a U.S.-based correspondent bank account for its redemption requests and, through its alleged agent, chose the latter.  *See* Molton Decl. Ex. 10, ECF No. 1185 (Sentry Confirmation of Order Received to redeem 340  shares of Sentry at HBUS); *see also* Joyce Decl. at 6–9, ECF No. 1186; *id.* at 12 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* ("Neither the fact that Fairfield Sentry was a U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* at 13 ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period.  To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

Vontobel next argues that any use of correspondent accounts that may have occurred was incidental and insufficiently related to the harm for which the plaintiffs seek redress.  *See* Reply at 8, ECF No. 1274 ("[R]edemption payments by Sentry may have momentarily passed through the U.S. correspondent accounts of Sentry and the Citco Subscriber before reaching Vontobel.

However, it is black letter law that a foreign party's incidental use of the U.S. banking system is insufficient to confer personal jurisdiction."). The Defendant cites the Second Circuit's opinion in *Hau Yin To*, 700 F. App'x 66, 66–67 (2d Cir. 2017) in support of this argument. In *Hau Yin To*, the Second Circuit affirmed an earlier ruling by the District Court, which had held that the defendants' passive use of a U.S.-based correspondent account was not a sufficient basis to confer personal jurisdiction over those defendants. *Id.* at 69; *see also Hau Yin To v. HSBC Holding, PLC*, 2017 WL 816136 (Bankr. S.D.N.Y. Mar. 2017). Contrary to Vontobel's argument, the Second Circuit's opinion in *Hau Yin To* does not support the Defendant's assertion here. As the District Court noted in its opinion in *Hau Yin To*, the "wiring of funds through New York" by certain foreign defendants — fund custodians that facilitated the fund transfers between BLMIS and its feeder funds — was "passive" and "incidental" because "the passage of money through the U.S. bank accounts …[was] not specifically directed by [the defendants] to facilitate the [BLMIS] Ponzi scheme." *See Hau Yin To*, 2017 WL 816136 at *7, n. 6.

Here, unlike the plaintiffs in *Hau Yin To*, the Liquidators do not allege that the Defendant, through its alleged agents, used U.S.-based correspondent accounts to facilitate the BLMIS Ponzi scheme. Instead, the Liquidators are seeking the imposition of a constructive trust related to numerous parties — including the Defendant — because the parties, through their alleged agents, requested and received redemption payments while knowing that the NAV was inflated. *See* Am. Comp. ¶¶ 205–216, ECF No. 679. Therefore, the Defendant's use of a U.S.-based correspondent account through its alleged agent for receiving redemption payments is an integral part of the Liquidators' claim. Moreover, the Plaintiffs have shown that the Defendant had the option to use a foreign correspondent account for its redemption requests, but instead used the U.S.-based

correspondent account through its alleged agent.  *See* Molton Decl. Exs. 9, 10 (Sentry Redemption Records); *see also* Joyce Decl. at 5–9, 11–13.

The Plaintiffs allege that Defendant received redemption payments totaling at least $574,065.70 from Sentry that the Citco Subscriber requested to be sent to a correspondent account at HBUS.  *See* Opp'n at 13.  The Plaintiffs also support their allegations with certain redemption requests and order confirmations that correspond to certain redemption payments.  *See* Molton Decl. Exs. 9, 10 (Sentry Redemption Records and Order Confirmations).

The Plaintiffs allege that Defendant and its agent "used U.S. correspondent accounts multiple times in transacting with Sentry."  Opp'n at 32.  Specifically, Defendant used U.S.-based correspondent accounts to make at least one subscription payment and to receive at least three redemption payments totaling $574,065.70 from Sentry between November 2005 to March 2007.  *See id.* at 13, 32; *see also* Molton Decl. Exs. 6, 9–10 (Subscription and Redemption Records).  The Defendant actively selected the correspondent account as a means of moving redemption funds through New York.  *See* Joyce Decl. at 8–9 (listing multiple "correspondent banks offer[ing] U.S. dollar correspondent accounts located outside of the U.S." during the relevant period).  Defendant was free to designate an account of its choice, inside the United States or outside, to effectuate transfers and chose one based in the U.S. to receive redemption payments.  *See id.* at 10–12 ("Factors Influencing Choice of Correspondent Account").

Vontobel, through its agent, accomplished the conduct at the heart of the Liquidators' claims regarding payments from Sentry through its use of the U.S.-based correspondent accounts. The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations supports a finding of sufficient minimum contacts.  *Licci IV*, 732 F.3d at 171; *id.* at 168 (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984

N.E.2d 893, 900 (N.Y. 2012) ("[A] foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States."); *see also Spetner v. Palestine Investment Bank*, 70 F.4th 632, 640 (2d Cir. 2023) ("[A] defendant foreign bank's 'repeated use of a correspondent account in New York on behalf of a client . . . can constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum.").[14]  Moreover, as this Court has previously noted, the New York Court of Appeals has held that a course of dealing between two foreign entities can be established through "14 currency exchange transactions" made through a New York bank, where the entities had made "five prior similar transactions" through the same bank. *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 325–26 (2016) (discussing *Indosuez Intl. Fin. v. National Reserved Bank*, 98 N.Y.2d 238 (2002)); *see, e.g., Fairfield Sentry Ltd. (In Liquidation), et al. v. SIX SIS Ltd.* (*In re Fairfield Sentry Ltd.*), 668 B.R. at 107.  However, in finding a course of dealing with the forum, the specific number of transactions is not the sole consideration; rather, "the quantity and quality of a foreign bank's contacts with the correspondent bank must demonstrate more than banking by happenstance." *Rushaid*, 28 N.Y.3d at 327.  Therefore, a course of dealing may be established through fewer forum transactions, if such transactions could demonstrate purposeful availment of the forum.  *See id.* at 327–29.

Here, the Liquidators have provided support for the allegation that the Citco Subscriber, acting agent of the Defendant, chose to use a correspondent account in New York to receive payments from Sentry.  *See* Opp'n at 13 ("[T]he Citco Subscriber instructed Sentry to wire the

---

[14]      Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an agent."  70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

redemption payments to the Citco Subscriber's U.S. correspondent account at HBUS."). While foreign options existed, the redemption forms show that Defendant selected and used a U.S.-based correspondent bank receive payments from Sentry. Vontobel's repeated receipt of tens of thousands of dollars of redemption payments for its investments in Sentry through U.S. correspondent accounts demonstrates its purposeful availment of the banking system of New York and the United States.

### 3. **Defendant's Business Contacts with the Forum**

The Liquidators assert that Vontobel "intentionally invested in BLMIS feeder funds Sentry and Sigma knowing that the Funds were designed to subsequently invest that money in New York-based BLMIS. [Vontobel] is subject to this Court's jurisdiction with respect to its Sentry and Sigma redemptions as a result of that conduct." Opp'n at 21, ECF No. 1184. Defendant describes the allegations concerning Defendant's subscription payments into the Fairfield Funds for the purpose of investing in BLMIS as the unilateral activity of a third-party, which Defendant argues is not appropriate to consider under *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984). Mem. L. at 16–17, ECF No.857; *see also* Reply at 5, ECF No. 1274 ("As the Second Circuit has already recognized, the Fund shareholders '(1) had no direct financial relationship with BLMIS, (2) had no property interest in the assets that the Feeder Funds invested with BLMIS, (3) had no securities accounts with BLMIS, (4) lacked control over the […] Funds' investments with BLMIS, and (5) were not identified or otherwise reflected in BLMIS's books and records.'") (quoting *In re Bernard L. Madoff Inv. Sec.*, 708 F.3d 422, 426–27 (2d Cir. 2013)).

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros*, 466 U.S. at 418. The Supreme Court found that "one trip" to the forum "for the

purpose of negotiating the transportation-services contract . . . cannot be described or regarded as a contact of a 'continuous and systematic' nature . . . ." *Id.* at 416. The Liquidators, however, have described more substantial contacts here.

First, the Liquidators point to documents FGG prepared and sent to Vontobel, after the Defendant communicated about the possibility of subscribing in the Fairfield Funds. *See* Opp'n at 7. These documents "made clear that the Funds' assets would be invested in BLMIS to take advantage of the 'split strike conversion strategy' associated with U.S-based BLMIS." *Id.* at 7; *see also* Molton Decl. Ex. 2 at -953 (June 2000 Sentry Memorandum, stating that "[t]he Company seeks to obtain capital appreciation of its assets through the utilization of nontraditional options trading strategies […]. The Manager has established a discretionary account for Sentry at Bernard L. Madoff Investment Securities [], a registered broker-dealer in New York, who utilizes a strategy described as 'split strike conversion.'"); *id.* Ex. 3 at -338 (October 1999 Sigma Memorandum, describing the "Business Objective of the Company" as "[to] achieve capital appreciation of its assets principally through the utilization of . . . [the] 'split strike conversion' [strategy,]" which BLMIS would implement). These documents show that Defendant was aware at the time that its investments in the Fairfield Funds were effectively investments in BLMIS in New York. Vontobel, through its agent, the Citco Subscriber, executed subscriptions into Sentry with this knowledge. *See* Molton Decl. Ex. 2 (June 2000 Sentry Memorandum); *id.* Ex. 3 (October 1999 Sigma Memorandum); *see also id.* Exs. 7 (Sentry Long Form Subscription Agreement), 8 (Sigma Long Form Subscription Agreement).

In August 2018, this Court held that it does not have personal jurisdiction over certain defendants due to subscription agreements that provided for consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the Fund." *Fairfield I*, 2018 WL

3756343, at *11.  The Liquidators here rely on the subscription agreements and private placement memoranda not to show consent, but to show that when Defendant invested in Sentry it did so knowing that it would avail itself of the benefits and protections of New York.  Opp'n at 21–28.  The subscription agreements, signed by Vontobel's agent, support the Plaintiffs' showing of contacts with the forum.

The Plaintiffs have supplied further support for the allegations of contacts.  Exhibits indicate that Vontobel conducted extensive due diligence prior to and during the subscription period, which information informed it of the relationship between the Fairfield Funds and BLMIS at the time it instructed the Citco Subscriber to invest in the Funds during the relevant period.  *See* Opp'n at 23–28; *see also* Molton Decl. Ex. 13 (November 2001 email exchange between an FGG U.S. employee with a "fggus.com" email address and a Finter employee with a "finter.ch" email address following an in-person meeting , with the Finter employee requesting additional copies of a certain Sentry brochure); *id.* Ex. 15 (June 2006 email from an FGG employee to a Finter employee, providing slides and Tear Sheets concerning Sentry's business operations in New York and elsewhere);  *id.* Ex. 16 (November 2006 email exchange between a FGG employee and a Finter employee, where the FGG employee attached additional Sentry Tear Sheets showing Sentry's return performance from 1990 to 2006, and requested the Finter employee to confirm Finter's "interest in making a subscription").

Therefore, the Court finds that the allegations and documentation provided by the Plaintiffs through jurisdictional discovery, taken together, sufficiently demonstrate facts supporting continuous and systemic contacts with the forum.

**4.** **Whether the Defendant's Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction**

The Court will address Vontobel's remaining arguments that the alleged contacts are not jurisdictionally relevant under Supreme Court precedent. Mem. L. at 16–18, ECF No. 857. Defendant argues that the Plaintiff's allegation that Citco Brokerage Customers knew funds would be commingled and partially invested in BLMIS accounts in New York is irrelevant to jurisdiction over Vontobel. *Id.* at 16. Defendant further argues that because the Supreme Court held in *Helicopteros* that "the unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State[,]" this Court should reject the Plaintiffs' attempt to "satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third-parties) and the forum State[]" under *Walden v. Fiore*, 571 U.S. 277, 284 (2014). *Id.* at 16–17.

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Walden*, 571 U.S. at 289. The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* As the Supreme Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's conduct . . . must form the necessary connection with the forum State." *Id.* at 285. Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investments into BLMIS in New York, as well as their selection and use of U.S.-based correspondent accounts, demonstrate that Vontobel took affirmative actions on its own apart from the conduct of the Plaintiffs. *See*

Opp'n at 21–28, ECF No. 1184. The Liquidators have shown that the Defendant knew and intended that, by investing in the Funds, Defendant's money would enter into U.S.-based BLMIS. *Id.* at 31–32; *see also* Molton Decl. Exs. 2 (June 2000 Sentry Memorandum), 3 (October 1999 Sigma Memorandum), ECF No. 1185. This certainty can be found in the Fairfield Funds' contractual obligation to invest at least 95% of the money they received in U.S.-based BLMIS. *See* Molton Decl. Ex.15, at -958 ("The Investment Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of investment) to alternative investment opportunities other than its modified 'split strike conversion' investments."). Moreover, the Plaintiffs have alleged that the Defendant, through its agent, conducted due diligence investigations and benefited from the materials that it received from FGG which confirmed the investments would be made with BLMIS in New York. Opp'n at 34–35.

The Court thus finds that Defendant's selection and use, through its agent, of U.S. correspondent accounts, due diligence, and communications with FGG concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong. The contacts are not random, isolated, or fortuitous. The contacts demonstrate Vontobel's purposeful activities aimed at New York in order to effectuate transfers from Sentry. The Plaintiffs have thus provided evidence sufficient to support a prima facie showing that the Defendant had minimum contacts with the forum. Accordingly, the Court finds that the Defendant's conduct would also satisfy the "more flexible jurisdictional inquiry" under the Fifth Amendment. *See Fuld*, 2025 WL 1716140, at *8.

C. **WHETHER THE CLAIM ARISES OUT OF OR RELATES TO THE DEFENDANT'S FORUM CONDUCT**

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, a court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the Plaintiffs' claims are "not predicated on whether the funds they seek to recover were ever placed with or controlled by BLMIS" and do not "focus on the decision to *invest* with the Funds as the basis for either liability or jurisdiction." Mem. L. at 16–17, ECF No. 857 (emphasis in original). However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated. *See* Am. Compl. ¶¶ 205–16, No. 679. The issue of knowledge of the inflated NAV is inextricably tied to the Defendant's investments with New York-based BLMIS. The allegations are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds. *Id.* ¶ 207. The Defendant's contacts with the United States, in investing in, in communications with, and redemptions from the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum. *See MSP Recovery Claims, Series LLC*

*v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at \*3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

### D. <u>WHETHER ASSERTION OF PERSONAL JURISDICTION IS REASONABLE</u>

If a defendant has sufficient minimum contacts, then the Court must ask "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Where the plaintiff "makes the threshold showing of the minimum contacts required for [exercising personal jurisdiction], a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at \*3 (quoting *Bank Brussels Lambert*, 305 F.3d at 129). Factors the Court will consider include the burden on the defendant, the interests of the forum in adjudicating the case, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies. *Id*. Indeed, the Supreme Court also evaluated several of these reasonableness factors in *Fuld*, after it noted that "the Fifth Amendment might entail [an] inquiry into the reasonableness of the assertion of jurisdiction in the particular case." *See Fuld*, 2025 WL 1716140, at \*11–12.

The Defendant argues that "the interests of the United States or New York is minimal at best as this dispute is between foreign (BVI) funds and their foreign investors, governed by foreign law." Reply at 11, ECF No. 1274. However, courts have recognized that the United States has a

strong interest in ensuring the integrity of its financial systems. *See, e.g., Licci IV*, 732 F.3d at 174 ("[T]he United States[] and New York [have an] interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends."). This Court has also repeatedly emphasized such interest in other adversary actions related to the BLMIS Ponzi scheme. *See Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Securities Services (Luxembourg) S.A., et al.* (*In re Fairfield Sentry Ltd.*), 658 B.R. 257, 277 (Bankr. S.D.N.Y. 2024); *see also Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Europe SE, Luxembourg Branch, et al.* (*In re Fairfield Sentry Ltd.*), 657 B.R. 1, 23 (Bankr. S.D.N.Y. 2024).

Defendant further notes that the Plaintiffs have already conceded that "'[t]he redemption transfers at issue here were purely foreign'" and that "'every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States.'" Mem. L. at 16, ECF No. 857 (quoting Opening Brief at 24). Vontobel then argues that "in pursuing this action in the United States, the Liquidators are engaging in forum shopping in order to circumvent the unfavorable decisions rendered against them in the BVI and recover redemptions that they themselves have described as 'purely foreign.'" Reply at 11–12 (quoting *In re Fairfield Sentry*, 458 B.R. 665, 686 (S.D.N.Y. 2011)).

The Court disagrees. Here, the Defendant presumes but fails to establish that the Plaintiffs have no legitimate interest in obtaining relief in the United States — especially considering that this dispute stems from a Chapter 15 proceeding that has intimate connections to the New York-based BLMIS Ponzi scheme. Defendant has not demonstrated how this forum would fail to provide effective relief. *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3. Vontobel does not explain what interest is impaired by precluding adjudication in another forum

or why that interest outweighs other factors in favor of exercising jurisdiction.  *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023).

Finally, Vontobel also believes that the burden of litigating this dispute in New York is significant for the Defendant, as the "witnesses and evidence related to Vontobel are located in or around Switzerland"  Reply at 11.  Moreover, they argue that "Swiss bank secrecy and data protection laws are extraordinarily strict, adding to Vontobel's burdens in this case." *Id.*

In 2012, this Court granted in part and denied in part a motion seeking relief as to the order staying the action and seeking expedited initial disclosures on certain beneficial holders.  *See* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799 (the "July 2012 Bench Ruling").  The Court stated in that ruling that it was "hard-pressed to find any compelling United States' interest in mandating discovery here *at this juncture* of the pending litigation."  *Id.* (emphasis added). Although the defendants before this Court in 2012 were able to describe "the strong and undeniable interest of many nations in enforcing their banking secrecy laws" and "significant bank customer confidentiality laws of no fewer than 30 countries, attested to by numerous declarations of foreign law experts and letters submitted by foreign governments" that could have been implicated or broken by complying with the Court's prior order, Vontobel now describes a potential exposure to liability under Swiss laws.  *Id.*; Reply at 11.  This Court lifted the stay and required the Defendant to proceed to discovery in 2021.  *See* Order Lifting Stay, ECF No. 675.  The July 2012 Bench Ruling shows that this Court can alleviate specific burdens identified by a defendant.  However, the mere potential for exposure to unspecified liability is not a burden that renders exercise of jurisdiction unreasonable.

36

The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum. However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023). The Defendant has not established that the Court's exercise of personal jurisdiction over it would be unreasonable. Further, Vontobel is represented by U.S. counsel and the United States has a strong interest in ensuring the integrity of its financial systems. The Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with "traditional notions of fair play and substantial justice . . . ." *See Int'l Shoe*, 326 U.S. at 316, 66 S. Ct. 154.

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the Amended Complaint. The Liquidators shall submit a proposed order consistent with the findings in this decision in accordance with Local Bankruptcy Rule 9074-1.

**IT IS SO ORDERED.**

Dated: August 1, 2025
      New York, New York

                         /s/ John P. Mastando III
                         THE HONORABLE JOHN P. MASTANDO III
                         UNITED STATES BANKRUPTCY JUDGE